Jack C. SCHOENHOLTZ, as Administrator of the Rye Psychiatric Hospital Center, Inc., Supplemental Retirement Income Fund-Fixed and Rye Psychiatric Hospital Center, Inc., Supplemental Retirement Income Fund-Variable, Plaintiffs,

v.

David E. DONIGER, I. Jay Lauer and Alexander Carlen, Defendants.

No. 83 Civ. 2740.

United States District Court, S.D. New York.

March 26, 1987.

■■■■■■■■■

Herrick & Feinstein, P.C., New York City, for plaintiffs; Frederick A. Nicoll, of counsel.

Cerrato, Sweeney, Cohn, Stahl & Vaccaro, White Plains, N.Y., Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Julius W. Cohn, White Plains, N.Y., Jay Greenfield, New York City, of counsel.

IRVING BEN COOPER, District Judge.

## INTRODUCTION

Plaintiff commenced this action alleging that defendants breached fiduciary duties to two employee retirement plans ("the Plans") at the Rye Psychiatric Hospital Center ("the Hospital") in Rye, New York in violation of the Employee Retirement Income Security Act of 1974 ("ERISA" or "Act"), 29 U.S.C. §§ 1001–1381 (1982). Following a non-jury trial on the merits of the case, we entered judgment on the liability issue in favor of plaintiff and against each defendant by our Findings of Fact ("FF"), Conclusions of Law ("CL") and Order filed on February 14, 1986.[1] The plaintiff now moves for an award of compensatory damages, attorney's fees and punitive damages. These matters were fully addressed at trial and have since been extensively briefed.

## I

## COMPENSATORY DAMAGES

**A. The Appropriate Measure of Damages**

■■ This Court now faces the "formidable task of finding an appropriate measure of damages, if any, with regard to all defendants found to be liable as fiduciaries." *Leigh v. Engle,* 727 F.2d 113, 137 (7th Cir.1984). The statutory provisions of ERISA grant us wide discretion in fashioning relief to make the Plans whole and protect the rights of the beneficiaries. *Gil-*

*liam v. Edwards,* 492 F.Supp. 1255, 1266 (D.N.J.1980). In pertinent part, § 409(a) of ERISA, 29 U.S.C. § 1109(a) (1982), provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate. . . .

In determining what the measure of losses ought to be in this case, we are guided by the recent decision of our Court of Appeals in *Donovan v. Bierwirth,* 754 F.2d 1049 (2d Cir.1985). There, the Court found liability for losses under § 409 even where the trust made a profit on the transaction. Finding the notion of opportunity cost fixed within the law of trusts, the Court determined that a trustee is liable for "'any profit which would have accrued to the trust estate if there had been no breach of trust.'" *Id.* at 1054 (quoting *Restatement (Second) of Trusts* § 205(c) (1959); *see also Leigh v. Engle,* 619 F.Supp. 154, 160 (N.D.Ill.1985) (construing *Donovan*). The Court stated:

> In view of the intent expressed by Congress in providing for the recovery of "losses," in the absence of evidence of congressional attempt to penalize, as such, violations of section 409, we hold that the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the [attacked] investment, with what the Plan would have earned had the fund been available for other Plan purposes. If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.

*Donovan,* 754 F.2d at 1056.

Plaintiff maintains under *Donovan* that the appropriate measure of losses to the Plans is the difference between what the

---

1. Familiarity with this opinion is assumed. 628

Plans would have realized from the investment of all available contributions had it not been for defendants' malfeasance, versus the Plans' actual asset value. More specifically, the losses to the Plans are claimed to be the difference between the value of the convertible preferred shares of Hospital stock the Plans should have purchased with the annual contributions made by the employer, and the value of the Dreyfus money market accounts in which contributions were actually invested. This measure, plaintiff argues, is consistent with our finding that "[t]he willful acts by defendants and their omissions prevented the Plans' investment of contributions in Hospital securities from the years 1980, 1981, 1982 and 1983." (FF 41).

Defendants take issue with plaintiff's proposed measure; their position is that investment in Hospital securities would have been speculative or less profitable than the value of the money market accounts. Moreover, defendants suggest an alternative to a cash award in the event we determine plaintiff is entitled to relief. They contend that the Plans can be made whole by turning back the clock and having the "appropriate" number of shares retroactively issued to the Plans *nunc pro tunc.*

■ We adopt plaintiff's proposed measure of losses which seeks to put the Plans in the position they would have been in had there been no breach. We find that this approach is consistent with the purpose of § 409(a) and the clear directive set forth in *Donovan,* 754 F.2d at 1056.

In contrast, defendants' proposed measure of losses is at variance with § 409. The retroactive issuance of those additional preferred shares the Plans should have had as of March, 1984 would not begin to make

plaintiff whole. The value of the relatively few shares already held by the Plans, as well as any which would be issued now, has been significantly impaired—so impaired, in fact, defendants elsewhere maintain that investment in such securities is inherently imprudent. (*Defendants' Memorandum of Law on the Issue of Damages and in Support of Their Motion to Reopen and Supplement the Record* at 31–40 [hereinafter *Defendants Memo I* ] ). Thus, the effect of now ordering the sale of shares to the Plans would be to shift losses to plaintiff—a violation of § 409(a).[2]

In short, we reject defendants' measure of damages in favor of plaintiff's, and find that the losses to the Plans shall be measured by the difference between the value of the convertible preferred shares of Hospital stock the Plans should have purchased and the value of the Dreyfus money markets accounts in which the contributions were actually invested.

## B. The Plans' Losses

Having settled upon a measure of damages, our inquiry turns to whether defendants in fact caused the Plans to suffer losses, and if so, how much.

To establish the Plans' losses owing to defendants' misconduct, plaintiff had Mr. Peter Kelston testify as an expert witness. Mr. Kelston's intimate knowledge of the Plans and the Hospital securities is not in dispute. In fact, in 1981 he specifically designed the convertible, preferred stock series that was intended to be sold to the Plans, and in each of the following two years advised the Hospital as to the value of, and a recommended minimum selling

---

**2.** Defendants, moreover, concede that their proposed measure of losses allows them to escape personal liability. *Defendants' Supplemental Reply Memorandum on the Issue of Damages and Reply Memorandum in Support of Motion to Reopen the Record* at 15. This result is clearly violative of § 409(a)'s requirement that a fiduciary in breach of trust be held personally liable to make good all losses to a plan. This result is prohibited under *Donovan,* too. The Second Circuit has made plain that any formula for determining losses must be responsive to the

important societal interest in deterring reckless and intentional fiduciary misconduct. *Donovan,* 754 F.2d at 1055. In this vital area of employee pension benefits, a penalty for breach of trust limited to the restoration of actual losses would have no deterrent effect. Instead, it would tempt the venal and unscrupulous to take the risk. The future welfare of millions of working men and women and their families is simply too precious to leave to such equivocal protection.

price for, such stock. (Tr. 1634–1645).[3] We were impressed with Mr. Kelston's first hand knowledge and, contrary to defendants' contentions, find him to be a credible witness.

Mr. Kelston determined that defendants' breach of their fiduciary duties caused the Plans to lose $458,961.00. (Tr. 1651–1654). This figure was arrived at by subtracting the amount which the Hospital's contributions to the Plans yielded as of March 1984 by way of its investment in the Dreyfus money market fund ($623,257.00), from what the Plans would have realized by August, 1983, if, in each year since August of 1981, all of the Hospital contributions to the Plans had been invested in Hospital stock ($1,082,218.00). (Tr. 1648–1654; Ex. 121).

Despite "[t]he 'imponderables of the valuation process' and the concomitant broad discretion traditionally granted to evaluators of corporate shares of stock," *Universal City Studios, Inc. v. Dupont & Co.*, 334 A.2d 216, 221 (Del.1975), defendants elected not to rebut Mr. Kelston's testimony. Neither the methodology employed by Mr. Kelston nor the results of his damage calculations were seriously challenged during the trial. Defendants urge, however, that we discount Mr. Kelston's opinion as being unworthy of credit. They contend that the witness' testimony lacked probative value because his damage calculations were based on erroneous premises and his methodology was inherently unreliable. Alternatively, defendants claim the Plans could not have suffered damages because investment in Hospital securities would not have been a prudent investment and, in any event, plaintiff should be estopped from seeking any damages incurred after December 15, 1982, when defendants allegedly ceased to be Plan trustees. We shall consider each of these contentions in turn.

### 1. The Investment Assumption

The initial premise for Mr. Kelston's damage calculations is that each of the Plans would have invested the entire amount of the annual contributions received from the Hospital to purchase Hospital securities. (Tr. 1648, 1651, 1734; Ex. 121). Defendants contend that this premise is incorrect as a matter of law, and that Mr. Kelston's conclusion cannot be the basis of an award.

The gravamen of defendants' contention is that the extent to which employee retirement plans can invest in employer securities is expressly governed by ERISA which prohibited the Plans from investing more than 10% of its assets in Hospital securities. Since Mr. Kelston's damage opinion assumes that 100% would be invested, defendants reason this assumption is incorrect by 90%.

Though some plans are limited to a 10% investment, ERISA authorizes an "eligible individual account plan" to invest up to 100% of its assets in "qualifying employer securities." ERISA § 407(b)(1), 29 U.S.C. § 1107(b)(1) (1982); *see also District 65, UAW, et al. v. Harper & Row Publishers, Inc.*, 586 F.Supp. 118, 119 (S.D.N.Y.1984). An "eligible individual account plan" is defined in ERISA § 407(d)(3)(A), 29 U.S.C. § 1107(d)(3)(A) (1982), to include an "employee stock ownership plan" ("ESOP"). Defendants argue that the Plans do not constitute an ESOP and thus cannot qualify as an eligible individual account plan which could invest 100% in employer securities.

An ESOP is defined in ERISA § 407(d)(6)(A), 29 U.S.C. § 1107(d)(6)(A) (1982), to be, *inter alia*, a combination of a stock bonus plan and a money purchase plan that are tax qualified and designed to invest primarily in employer securities. Defendants contend that the Variable and Fixed Plans together do not constitute a "combination" ESOP—that is, a "stock bonus plan and money purchase both of which are qualified." ERISA § 407(d)(6)(A).

While the parties are in agreement that the Fixed Plan is a "money purchase plan,"

---

**3.** Throughout this opinion, the letters "Tr." followed by a number in parentheses indicates a particular page number in the transcript. The same applies to an "Ex." which refers to a specific trial exhibit.

Defendants maintain that the Variable Plan is not a "stock bonus plan" for two technical reasons. First, defendants claim the Variable Plan cannot be a stock bonus plan because its participants allegedly do not have the right to demand their benefits be distributed in either cash or employer securities. However, the Plans' documents in Section 5.03 provides in pertinent part that:

> The Participant or his Beneficiary may elect to sell all or any part of any securities then to be distributed....

(Ex. 1, 2). This right to elect to sell would make no sense if it did not mean that the participants or beneficiaries could first elect to take securities instead of cash and we find, as a matter of fact, that participants were intended to have such a right.

Second, defendants claim that a stock bonus plan which holds more than 10% of its assets in employer securities must pass voting rights through to plan participants, which these plans do not expressly do and that because the Plans in issue do not have voting securities, neither may constitute a stock bonus plan. We disagree.

The ESOP definition contained in § 407(d)(6) of ERISA requires that one of the two plans in a "combination" ESOP be a tax qualified stock bonus plan. § 401(a)(22), 26 U.S.C. § 401(a)(22) (1982 & Supp. III 1985), permits a tax qualified stock bonus plan to invest more than 10% of its assets in employer securities only if the plan meets the requirements of Internal Revenue Code § 409(e), 26 U.S.C. § 409(e) (1982 & Supp. III 1985). § 409(e)(3), in turn, states:

> If the employer does not have a registration-type class of securities, the plan meets the requirements of this paragraph only if each participant in the plan is entitled to direct the plan as to the manner in which voting rights under employer securities which are allocated to the account of such participant are to be exercised with respect to a corporate matter which (by law or charter) must be decided by more than a majority vote of outstanding common shares voted.

■ This section does not require that the owners of securities in the plan have voting rights, but only that participants be able to exercise whatever voting rights exist in the stock held in trust for them. *See* Elinsky, *The Uses of ESOPs*, 42 ERISA Supplement N.Y.U. Inst. on Fed. Tax'n 7–1 at 7–18 (1984) (with respect to registration type securities "if the stock held by the ESOP is not entitled to vote, no voting right requirements exist. If stock held by the ESOP is not publicly traded and such stock is voting stock, the ESOP must allow each plan participant to direct the plan as to the manner in which the voting rights are to be exercised...."); R. Frisch, *Employee Stock Option Plan (ESOP) Offers Investment Potential in Hospitals, Federation of American Hospitals Review* at 43 (August 1980) ("Furthermore, non-voting stock can be used in the non-leveraged ESOT.").

■ Defendants counter that the term "employer securities" as used in § 409(e) is statutorily defined in § 409(*l*), 26 U.S.C. § 409(*l*) (1982 & Supp. III 1985), to require that employer stock allocated to a stock bonus plan have voting rights. This argument fails at the threshold because § 409(*l*) does not apply here. For ERISA purposes, the only relevant definition of "qualifying employer securities" is that contained in § 407(d)(5) as repeated in 29 C.F.R. § 2550.-407d–5, which includes any form of stock, without regard to voting rights. § 409(*l*) is entitled "Qualifications for Tax Credit Employer Stock Ownership Plans." The Plans do not constitute a tax credit ESOP (TRASOP) and defendants do not contend that they do. Additionally, § 409(*l*)(1) expressly states that its definition of "employer securities" is "[f]or purposes of *this* section" (emphasis added)—the section describing the qualifications for TRASOPs, not ESOPS.

■ Even assuming *arguendo* § 409(*l*) applies, it is not clear that securities in a plan must have voting rights to be tax qualified. In relevant part § 409(*l*) states:

> (2) ... the term "employer securities" means common stock issued by the employer ... having ... voting power ... equal to or in excess of—

(A) that class of common stock of the employer ... having the greatest voting power....

This section does not preclude qualification of a plan if employer stock allocated to the plan gives no voting rights to its participants. On the contrary, under § 409(*l*) employer stock need only pass through voting power "equal to or in excess of" the amount of voting power held in said stock by the employer. In this way, an employer is prevented from retaining a disproportionate share of voting power by issuing securities to the employees and retaining voting rights. It follows that if the employer holds no voting power in stock allocated to a plan, no voting power need be passed through to the plan participants. In the instant case, the Hospital held no voting power in the Common B stock; consequently, we find that the fact that plan participants had no voting power thereunder is of no moment. In short, we find that because the Variable Plan is a stock bonus plan and the Fixed Plan is a money purchase plan, the two constitute a combination ESOP.[4]

### 2. *Mr. Kelston's Methodology*

█ Defendants alternatively assert that even if the Plans could have invested all contributions in Hospital securities, Mr. Kelston's damage calculations should still be discounted because his methodology is unsound. The focal point of defendants' attack is Mr. Kelston's opinion regarding the value of the Hospital stock the Plans would have purchased but for defendants' malfeasance.

In calculating the stock's value, Mr. Kelston could not refer to its market value—the Hospital corporation is closely held and no public market exists in which to determine what a willing buyer would be prepared to pay. As a consequence, Mr. Kelston endeavored to appraise the value of the stock by determining its "investment value."

The term "investment value" is not a word of art. It is not subject to simple definition, but involves an approach to stock valuation that emphasizes the past earnings record of a corporation. *See Comment, Elements in Valuation of Corporate Stock*, 55 Mich.L.Rev. 689, 693–95 (1957) [hereinafter *Corporate Stock*]; Note, *Stock Appraisals: The Dissenting Stockholder and the Concept of Value*, 16 Brooklyn L.Rev. 86, 96–97 (1950) [hereinafter *Value*]. The investment value method is a commonly used and reasonable yardstick for valuing shares. *Id.* Indeed, it is perhaps the least controversial method for valuing the stock of a closely held corporation primarily engaged in selling services to the public. W. Carey & M. Eisenberg, *Cases and Materials on Corporations* at 128 (5th ed. 1980); *Value, supra* at 96; *see also Dudley v. Mealey*, 147 F.2d 268, 270 (2d Cir.) (Hand, J.) ("The Supreme Court has several times said that the best test of the value of a going commercial enterprise is its earning capacity."), *cert. denied*, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945).

"In computing investment value no succinct mathematical formula is readily available. The appraisers have a fairly wide discretion here being limited only to producing a reasonable estimate in accordance with the facts proven." *Value, supra* at 97. Generally speaking, however, the investment value method consists of two components: (1) the establishment of an "earnings figure"; and (2) the selection of a capitalization ratio or "earnings multiplier." *See* Note, *Valuation of Dissenters' Stock Under Appraisal Statutes*, 79 Harv. L.Rev. 1453, 1464–67 (1966); *Corporate Stock, supra* at 694.

---

**4.** In passing we note defendants' hyper-technical argument that the Plans do not constitute an ESOP because the Plans' documents do not say *in haec verba*, that they are ESOPS. § 407(d)(6)(A) of ERISA, 29 U.S.C. § 1107(d)(6)(A) (1982) requires only that an ESOP be "designed to invest primarily in qualifying employer securities." It is unreasonable to read this language to mean that a plan must be formally designated as an ESOP in order to be an ESOP. When the Plans were authorized in 1979, investment "primarily in qualifying [Hospital] securities" was the unequivocal intention of the trustees. (FF 5). Indeed, the Plan documents so state (Ex. 1, 2, at § 8.09), and defendants effectively so concede, (*Defendants' Memo I* at 15).

### a. *The Earnings Figure*

Mr. Kelston's damage calculations were based on the theory that the Hospital securities intended for the Plans would have appreciated in value at a rate greater than the interest earned by the funds invested in the Dreyfus money market accounts. (Tr. 1652–53). Plan-held Hospital securities would have appreciated to such a degree, in Mr. Kelston's opinion, because the Hospital would have been able to use the Plans' annual stock purchases to reinvest in the business of the Hospital and thereby enhance its earnings. (Tr. 1651–52, 1704).

The rate of return the Hospital would have realized if, in fact, the Plans' available funds had been used to purchase Hospital securities is called an "earnings figure." *Id.* Typically, an earnings figure is calculated on the basis of a corporation's recent earnings history. *See, e.g., In re Valuation of Common Stock of Libby, McNeil & Libby,* 406 A.2d 54, 65 (1979). This is precisely what Mr. Kelston did here. In arriving at an average annual earnings figure for the Hospital, he "utilized ... the actual historical returns on investment that the hospital had demonstrated in the past." (Tr. 1648).

Defendants argue that Mr. Kelston's earnings figure is based on the assumption that the Hospital would have enjoyed spiraling growth and profits. This assumption, they claim, is specious because the record shows that the Hospital would have had difficulty expanding its existing physical facility. Since this fact allegedly would have precluded the Hospital from doing anything with additional capital, defendants reason that the Hospital could not have appreciated to the degree Mr. Kelston suggests; thus his earnings figure is too high.

We disagree with defendants' contention. We find that Mr. Kelston's earnings figure is not grounded on the notion that the Hospital was, in defendants' words, "something akin to a perpetual motion machine in which everything could go well." (*Defendants' Memo I* at 4). On the contrary, as pointed out above, Mr. Kelston applied to the additional funds the rate historically earned by the Hospital on invested capital and reasonably to be anticipated for the immediate future. (Tr. 1647–55).

Similarly, we are not persuaded by defendants' argument that the Hospital could not have expanded its existing facility. Although Mr. Kelston's evaluation was not predicated on the forecast of an expansion of the existing facility (Tr. 1704), such expansion was possible. Because the average patient population had been only 25–26, and the operating certificate allowed up to 41 beds, funds could have been profitably employed to increase the patient population. (Tr. 612, 1701–02, 1735).

Additionally, we find that the Hospital could certainly have reinvested in the business of the Hospital. For instance, but for defendants' conduct, the Hospital could have expanded in a location other than where it is situated or it could have sought to acquire another institution.

Furthermore, defendants' position is not strengthened by stressing that the Hospital might not have done anything with the money. As the Court stated in *Donovan,* 754 F.2d at 1056:

> Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.
>
> . . . .
>
> This is nothing more than application of the principle that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer.

Thus, *Donovan* squarely places the burden on defendants to prove that the Hospital's return on investment would not have been maintained, at least at historical levels. We find that defendants have failed to meet this burden.

Finally, defendants contend that the earnings figure cannot support a damage

award because Mr. Kelston allegedly failed to take into account various negative attributes of Hospital securities. We are not told how defendants know this to be so and must conclude that they are speculating. Moreover, the trial record completely undercuts defendants' position. Mr. Kelston designed the securities that defendants here argue he did not fully consider. He had a detailed knowledge of the Hospital's current and past financial history. (Tr. 1645–46, 1750). In view of his long experience with these particular securities and his financial expertise in general, we find defendants' argument on this point to be wholly without merit.

█ It is of course impossible with certainty to predict what the Hospital earnings would have been had the additional funds been available and had defendants not virtually halted all but the day-to-day operations of the corporation. However, it is defendants—not plaintiff—who must bear the risk of any uncertainty which their wrong has created. Where the complained of injury

> is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such a case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *De Long Corporation v. Lucas*, 278 F.2d 804, 810–11 (2d Cir.) (Friendly, J.), *cert. denied*, 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960).

Accordingly, we adopt Mr. Kelston's conclusions as to earnings.

### b. *The Earnings Multiplier*

Under the investment value method, once an earnings figure has been defined, a "multiplier" must be chosen. The choice of a multiplier is a difficult task that lies peculiarly " 'within the realm of judgment [for which] there is no hard and fast rule....' ". *Universal*, 334 A.2d at 218 (quoting *Application of Delaware Racing Association, Inc.*, 42 Del.Ch. 406, 213 A.2d 203, 213 (Del.1965)).

Here, Mr. Kelston chose multipliers for 1981, 1982 and 1983. (Ex. 121). Defendants claim that the method Mr. Kelston employed for deriving these multipliers was unsound; they allege that he arrived at them by using as a guide multipliers of public companies which are not comparable to stock held in the privately-held Hospital.

Defendants' argument is based on an assumption unsupported by the record or expert testimony—namely, that Mr. Kelston failed to consider relevant differences between public companies and the Hospital corporation. The record is devoid of even an inference that Mr. Kelston failed to take such factors into account. What the record does show is that Mr. Kelston considered the most important factors to be taken into consideration in deciding upon a multiplier: (1) the nature of the business; (2) the risk involved; and (3) the stability or irregularity of earnings. (Tr. 1635; Ex. 89, 112, BE). *See e.g., Valuation of Stock of Closely Held Corporations*, 2 Am.Jur.Proof of Facts 2d 1, 24 (1974) (quoting Rev.Rul. 59–60, 1959 C.B. 237, 243).

During the course of the trial defendants did not challenge Mr. Kelston's choice of multipliers by way of expert or any other testimony. "The appraiser's choice of a multiplier is largely discretionary and will be upheld if it is 'within the range of reason.' " *Piemonte v. New Boston Garden Corp.*, 377 Mass. 719, 387 N.E.2d 1145, 1150 (1979) (quoting *Universal*, 334 A.2d at 216). Given the "innate impreciseness of a chosen multiplier," *Universal*, 334 A.2d at 216, the fact that Mr. Kelston considered all relevant factors in arriving at his choices, and our favorable impression of

Mr. Kelston, we find the multipliers he chose to be well within reason.

### C. The Plan Documents and Mr. Kelston's Evaluation

Defendants further argue that the Plan documents expressly provide that Hospital securities be valued by an accountant. Since Mr. Kelston is not an accountant, defendants reason that his evaluation could not have complied with the Plans and must be discounted.

■ This argument involves a *non-sequitur.* The Plans may require that valuation of Hospital securities be performed by an accountant. It does not follow as a matter of law, however, that plaintiffs can prove the value of Hospital securities only through the testimony of an accountant. Defendants offer us no reason in law or common sense to think otherwise; we therefore decline to discount Mr. Kelston's testimony.

### 3. The Prudence of Investment in Hospital Securities

Defendants argue that the purchase of Hospital securities by the Plans in any event would have been imprudent and, thus, unlawful under ERISA. Two reasons are offered by defendants in support of this position. First they claim:

> It is simply too risky to put any (let alone 100%) of the retirement security for semi-skilled and unskilled employees in non-voting, non-marketable, non-dividend paying securities of a small closely held corporation which is torn by dissension, blocked from growth, facing dissolution, and beset with many other legal and practical problems.

(*Defendants' Memo 1* at 7).

■ Defendants' newly found concern for the welfare of the Hospital's employees is laudable. However, we cannot lose sight of the fact that the turmoil of which defendants speak was of their own making. The smooth operation of the Plans was thwarted, and the Hospital nearly paralyzed, because of defendants' multiple breaches of duty in their roles as shareholders, directors and Plan fiduciaries. We

do not believe that defendants can now come in and assert as a defense that investment in Hospital securities was too uncertain a venture to be prudent; had defendants not engaged in their boycotting and disruptive tactics there would be no question about the prudence of such investment. To allow this defense would be to allow defendants to profit from their own wrong. *See generally, Space Conditioning, Inc. v. Insurance Co. of North America,* 294 F.Supp. 1290, 1295–96 (E.D.Mich. 1968), *aff'd,* 419 F.2d 836 (6th Cir.1970); *People v. Schmidtt,* 216 N.Y. 324, 341, 110 N.E. 945, 950 (1915) (Cardozo, J.), *reh'g denied,* 216 N.Y. 762, 111 N.E. 1095 (1916).

■ Likewise unpersuasive is defendants' claim that Plan trustees had insufficient information with which to make a prudent investment in Hospital securities. The trial record is replete with evidence showing the extreme care and prudence that Dr. Schoenholtz used in approaching all aspects of the Plans. (CL L). Beginning with his investigation and retention of experts in the field to design appropriate plans, to the information, including continued financial information, he provided to the directors and trustees, to his care in having Mr. Kelston available to answer directors' questions, Dr. Schoenholtz provided numerous opportunities for the defendants to gain information about Hospital securities. (*See, e.g.,* Tr. 808–18, 1634; Ex. 108, 109, 110).

### 4. Limits on the Plans' Losses

Finally, defendants argue that damages should be limited in the event we find plaintiff suffered losses as a result of being denied the opportunity to invest in Hospital securities. Because plaintiff took the position that defendants ceased being trustees on December 15, 1982, after the election of directors which defendants boycotted, defendants maintain that they cannot be liable for their subsequent conduct.

■ ERISA—not plaintiff or defendants—defines who is a fiduciary. *See* § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). Defendants were obliged to

fulfill their fiduciary duties as trustees, investment managers and custodians until their resignations were effective on August 26, 1983. (FF 34). Additionally, we previously held defendants owed fiduciary duties to the Plans in their capacities as shareholders and directors of the Hospital throughout the events in controversy. (CL K). Accordingly, we reject defendants' argument and find that plaintiff's damages should not be limited.

### C. Summary

We are compelled to reiterate our unalterable impression that Mr. Kelston's testimony was entirely credible and his damage calculations the product of an orderly and logical deductive process. Since all of the above arguments to the contrary are without merit, we find defendants liable to the Plans for compensatory damages in the amount of $458,961.00, the difference between what Mr. Kelston testified the Plans would have earned from investment of all available contributions had it not been for the malfeasance of defendants and the value of the money market accounts into which contributions were actually invested, with interest thereon from April 1, 1984.

## II

### ATTORNEYS' FEES

### A. Plaintiff's Entitlement to Attorneys' Fees

Plaintiff requests reasonable attorneys' fees and costs under section 502(g) of ERISA, 29 U.S.C. § 1132(g) (1982), which provides:

In any action under this subchapter ... the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

The parties agree that § 502(g) vests the Court with broad discretion, to grant or deny an award in whole or in part. *See American Communications Association,*

Local 10, I.B.T., v. Retirement Plan for Employees of RCA Corp., 507 F.Supp. 922, 923 (S.D.N.Y.1981) (Weinfeld, J.); *Fase v. Seafarers Welfare & Pension Plan,* 589 F.2d 112, 116 (2d Cir.1978) (Friendly, J.). However, "[n]either the language of 502(g)(1) nor ERISA's legislative history furnishes any guidelines as to when courts should award attorney's fees." Note, *Attorney's Fees Under ERISA: When Is an Award Appropriate?,* 71 Cornell L.Rev. 1037, 1042 (1986) [hereinafter *Attorney's Fees]; see also American,* 507 F.Supp. at 923.

Our Court of Appeals has indicated that a District Judge's discretion to award fees under ERISA is not unlimited. *See Miles v. New York State Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 602 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *see also Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 828 (7th Cir.1984). We must consider the following factors in deciding whether to award attorneys' fees in the present case:

(1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to personally satisfy an award of attorneys fees, (3) whether or not an award of attorneys fees against the offending parties would deter other persons acting under similar circumstances, (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position.

*Miles,* 698 F.2d at 602, n. 9; *Morales v. Plaxall, Inc.,* 541 F.Supp. 1387, 1391–92 (S.D.N.Y.1982). "No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address in applying section 502(g)." *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980).[5]

---

**5.** We are mindful that proper consideration of these factors will usually lead to the conclusion that a prevailing plaintiff should recover attorneys fees. *McConnell v. MEBA Medical & Benefits Plan,* 759 F.2d 1401, 1406, *superseded,* 778 F.2d 521 (9th Cir.1985); *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344, 1356 (8th Cir. 1980) (*quoting Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). In the words of our

Applying the appropriate factors to the case at hand leaves no room for doubt that defendants' conduct both prior to and during the litigation of this case justifies an award of attorneys' fees and costs to plaintiff.

"Courts considering whether to award attorneys' fees to a prevailing plaintiff should first examine whether the defendant[s] acted in bad faith." *Attorney's Fees, supra* at 1062. If so, an award is almost always granted. *Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 590 (9th Cir.1984). In the present case we conclusively decided defendants' bad faith in our opinion on liability dated February 14, 1986. We found, *inter alia,* that defendants "jointly planned and embarked upon a scheme to gain control of the Hospital operations." (FF 8). In their quest to achieve this end, defendants

> willful[ly] ... prevented the Plans' investment of contributions in Hospital securities for the years 1980, 1981, 1982 and 1983, ... [and] acted with wanton indifference to the rights of the participants and beneficiaries. They knew or should have known that their conduct was injurious to the laudable objectives of the Plans and the beneficiaries to whom they owed the plain and obvious duty to protect.

(FF 41–42). Thus, we concluded that each

> defendan[t] failed to act exclusively for the benefit of the participants and beneficiaries of the Plans. Indeed, the evidence clearly demonstrates that defendants acted solely to further their personal interests by allowing their disagreements with Dr. Schoenholtz on corporate matters and hospital business to prevent any action in favor of the Plans for a period of almost two years.

(CL C). Consequently, pursuant to § 404(a) of ERISA, 29 U.S.C. § 1104(a) (1982), we held that defendants

> willfully and intentionally failed to carry out their fiduciary responsibilities to the

Plans as shareholders and directors of the Hospital....

(CL K).

Further evidence of defendants' bad faith is revealed by some of the tactics they employed during the discovery phase of the litigation. On three separate occasions during the course of the litigation we severely criticized defendants for their dilatory conduct. First, in our Order dated December 28, 1983, we held "defendants dilatory in their response to legal proceedings" and granted a motion by plaintiff to compel discovery. The second arose from the refusal of one of the defendants to attend his deposition. In a separate decision, also dated December 28, 1983, we stated that the court would "not countenance dilatory tactics." Accordingly, we awarded plaintiff a bill of costs on this motion, including expenses incurred by plaintiff by reason of defendants' failure to appear for depositions. Finally, in our May 4, 1986 disposition dealing with a number of motions, we held defendants' untimely service of "extensive and frivolous" requests for admissions on the discovery deadline "an unworthy tactic."

Although defendants' bad faith—which is abundantly clear from the foregoing—is itself sufficient basis for the award of attorneys' fees, each of the other relevant factors weighs heavily in favor of such award.

The deterrent effect of an award of attorneys' fees here is manifest. "If defendant employers face the prospect of paying attorneys' fees for successful plaintiffs, they will have added incentive to comply with ERISA." *Carpenters Southern California Administration Corp. v. Russell,* 726 F.2d 1410, 1416 (9th Cir.1984).

With respect to the relative merits of the parties' positions, a greater disparity could not be imagined. On the one hand, we held that defendants willfully and wantonly breached their fiduciary duties under ERISA. On the other hand, we found that "Dr. Schoenholtz acted prudently, properly

Court of Appeals: "attorneys' fees may be awarded to the prevailing party under ERISA in the absence of some particular justification for

not doing so." *Birmingham v. Sogen-Swiss International Corp. Retirement Plan,* 718 F.2d 515, 523 (2d Cir.1983).

and in accordance with the requirements of law in every respect by commencing this action for the benefit of the Plan participants and beneficiaries." (CL L). Furthermore, we rejected all of defendants' affirmative defenses and counterclaims. (CL L–P). Defendants cannot reasonably argue that the relative merits of the parties' positions are close.

Defendants argue against an award of attorneys' fees by stressing the importance of a party's ability to pay as a factor, reasoning that because they are "private individuals, not professional or corporate trustees, ... [t]hey will be hard pressed to pay" an award. (*Defendants' Memo I* at 48). Even if allegedly hard pressed, a matter on which defendants have not sustained any burden of persuasion, we are unconvinced under the instant circumstances that this factor is a sufficient ground to deny an award of attorneys fees. While the claim has been considered, it "is not a determinative factor."[6] *Korn v. Levine Bros. Iron Works Corp.*, 574 F.Supp. 836, 844 (S.D.N.Y.1983).

### B. Attorneys' Fees and Costs Incurred by Plaintiff

Having decided that plaintiff is entitled to reasonable attorneys' fees and costs, we now turn to plaintiff's specific requests.

### 1. Attorney's Fees and Costs Incurred by Plaintiff Through March 31, 1986

█ Plaintiff prays first for $367,-226.16, representing attorneys' fees and costs incurred through March 31, 1986. Defendants do not quarrel with the "reasonableness" of this figure. In fact, defendants have stipulated that there is "no basis for challenging the accuracy of the figures, the reasonableness of the amount of time expended by plaintiff's counsel, or

the appropriateness of the disbursements." (*Stipulation and Order* dated May 1, 1986). Given this sum is the product of well over three years of unusually bitter litigation—involving numerous proceedings with complex issues—we have no reason to question its reasonableness. *See PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir.1984) (stipulations are generally binding on the court). Accordingly, plaintiff's first request is granted.

### 2. Attorneys' Fees and Costs Incurred by Plaintiff Between April 1 and May 15, 1986

Plaintiff next requests $36,875.17, representing attorneys' fees and out-of-pocket disbursements incurred between April 1 and May 15, 1986. Defendants do not challenge the reasonableness of this sum. We, too, do not find this sum unreasonable. Accordingly, we grant plaintiff's request.

### 3. The Requests of Doctors Essman, Pagliaro and Schoenholtz for Attorneys' Fees

Finally, Doctors Essman, Pagliaro and Schoenholtz (individually) request legal fees in the sum of $34,762.50. This figure represents those fees incurred by the doctors between May, 1983, and March, 1984, as a result of having to defend against cross-claims served by defendants on May 3, 1983. In our May 4, 1984, disposition we held that the cross-claims were mooted by reason of defendants' failure to include them in their answer to plaintiffs' amended complaint. At that time the doctors requested we hold in abeyance, pending the final resolution of this action, a consideration for an award of legal fees.

█ The issue is now ripe for disposition. Upon a consideration of the frivolous nature of defendants' cross-claims and the fact that defendants do not contest the

---

**6.** We note in passing that those cases which defendants cite in support of a contrary conclusion are inapposite. They involve offending parties of modest means who clearly would have been burdened in the extreme by being cast in liability. *See, e.g., Rosati v. Local Union 325*, No. 80 Civ. 874, slip op., (N.D.N.Y. January 24, 1983) (offending party was an individual plaintiff who sued to review his termination from an apprentice training program); *American Communications Association, Local 10, IBT., v. Retirement Plan for Employees of RCA Corp.*, 507 F.Supp. 922 (S.D.N.Y.1981) (offending parties were individual union members who would have been placed in bankruptcy by having to pay an award).

reasonableness of the attorneys' fees and costs the doctors claim they incurred, we find $34,762.50 is fair and reasonable. We hence award to the doctors against defendants individually and jointly the sum of $34,762.50 in attorneys' fees and costs.

## III

## PUNITIVE DAMAGES

Plaintiff argues that pursuant to § 409(a) of ERISA, 29 U.S.C. § 1109(a) (1982), he is entitled to punitive damages in the sum of $1,000,000.00. Defendants counter that ERISA does not provide for recovery of punitive damages and, even if it did, defendants' acts do not warrant an award. The courts of appeal have split on the issue, *compare Kuntz v. Reese*, 760 F.2d 926, 938 (9th Cir.1985) (punitive damages available in "appropriate cases" under § 409(a)), *with Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1462 (5th Cir.1986) (punitive damages not available under 409(a) and 502(a)(3)); *Powell v. Chesapeake & Potomac Telephone Co.*, 780 F.2d 419, 424 (4th Cir.1985) (punitive damages not available under ERISA § 502(a)(3)), *cert. denied*, ⸺ U.S. ⸺, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986); *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1216 (8th Cir.) (dictum that punitive damages not available under ERISA), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), and the Second Circuit has yet to squarely address it. The Supreme Court has recently held that an *individual beneficiary* cannot recover punitive damages under § 409(a) of ERISA. *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). However, the Court expressly left open the issue at hand: "the extent to which § 409 may authorize recovery of ... punitive damages from a fiduciary by a *plan*." *Id.* 105 S.Ct. at 3092 n. 12 (emphasis added).[7]

### A. The Availability of Punitive Damages Under ERISA

ERISA itself does not explicitly prescribe or proscribe punitive damages. § 409(a) does state that anyone who breaches a fiduciary duty to a plan "shall be subject to *such other equitable or remedial relief* as the Court may deem appropriate (emphasis added)." Thus, we must determine if "such other equitable or remedial relief" includes punitive damages.

### 1. The Language of § 409(a)

The critical language of § 409(a) permits that punitive damages should be allowed; that this remedy falls within the broad categories of both equitable and remedial relief.

In an action for equitable relief, the "strong current of modern decisions" holds that punitive damages are available. D. Dobbs, *Handbook on the Law of Remedies*, § 3.9 at 211 (1973); 22 Am.Jur.2d *Damages* § 290, at 327 (1964); *see also* annotation, *Power of Equity Court to Award Exemplary or Punitive Damages*, 48 A.L.R.2d 947 (1956 & Supp.1986) (collecting cases). Although many older cases state that courts lack power in equity actions to award punitive damages, this increasingly antiquated view

> presupposes a court intrinsically limited to granting remedies solely equitable in historical origin....

No amount of authority ... should persuade us that Judge Cardozo was wrong when he said.... "The whole body of principle, whether of law or of equity, bearing on the case, becomes the reservoir to be drawn upon by the court in enlightening its judgment." Maitland expressed the same view when he predicted that "The day will come when lawyers will cease to inquire whether a

---

7. Despite this language, defendants maintain that under *Massachusetts Mutual's* rationale we are constrained to hold that punitive damages are unavailable to a plan under § 409. We disagree. *See* Note, *Participant and Beneficiary Remedies Under ERISA: Extracontractual and*

*Punitive Damages After Massachusetts Mutual Life Insurance Co. v. Russel*, 71 Cornell L.Rev. 1014, 1025 (1986) [hereinafter *Punitive Damages*] ("the opinion does not represent a blanket prohibition of ... punitive damages under ERISA.").

given rule be a rule of equity or a rule of common law...."

*I.H.P. Corp. v. 210 Central Park*, 12 N.Y.2d 329, 332, 189 N.E.2d 812, 813, 239 N.Y.S.2d 547, 548–49 (1963) (punitive damages granted in action for equitable relief).

 Given that "no reason of substantive policy or judicial administration ... militate[s] against the award of punitive damages in an action for equitable relief," we find that punitive damages are a form of "equitable relief" within the meaning of § 409(a). Note, *Punitive Damages Held Recoverable in Action for Equitable Relief*, 63 Colum.L.Rev. 175, 178 (1963). *Contra Whitaker v. Texaco, Inc.*, 566 F.Supp. 745, 751 (N.D.Geo.1983).

A priori, § 409(a)'s reference to remedial relief permits that punitive damages be allowed. "[P]unitive damages are 'a particular *remedial* mechanism normally available in the federal courts' ... to redress the violation ... of a citizen's ... rights." *Carlson v. Green*, 446 U.S. 14, 22, 100 S.Ct. 1468, 1473, 64 L.Ed.2d 15 (1979) (emphasis added). *See also, Black's Law Dictionary* 1162 (5th ed. 1979) ("remedial relief" relates to the measures used by the judiciary in enforcing rights).

### 2. Legislative History and Trust Law Concepts

ERISA's legislative history provides additional support for the view that punitive damages are recoverable against plan fiduciaries. Although Congress never directly addressed the issue of punitive damages, one of the Act's declared purposes was to protect employees' interests in benefit plans by "providing for appropriate remedies, sanctions, and ready access to the Federal Courts." ERISA § 2(b), 29 U.S.C. § 1001(b) (1982). To this end, Congress provided for the courts to develop a federal common law to govern ERISA disputes. *See Menhorn v. Firestone Tire & Rubber Co.* 738 F.2d 1496, 1499 (9th Cir.1984). "Thus, the remedies to which Congress referred need not be explicitly set forth in the statutory text." *Punitive Damages*, 71 Cornell L.Rev. at 1027.

Moreover, the legislative history suggests that had Congress directly addressed the issue, in all likelihood it would have embraced a judicial declaration of the availability of punitive damages in appropriate cases. "The Act's legislative history ... indicates that Congress' intent was 'to provide the full range of legal and equitable remedies available in both state and federal courts.'" *Donovan v. Bierwirth*, 754 F.2d at 1052 (quoting H.Rep. No. 533, 93d Cong., 2nd Sess., *reprinted in* 1974–3 U.S. Code Cong. & Ad.News 4639, 4655); *see also* S.Rep. No. 127, 93d Cong., 1st Sess. 35 (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 4838, 4871. We may fairly assume, therefore, that Congress intended to include all forms of remedies under ERISA, including punitive damages.

Congress afforded courts additional guidance in fashioning remedies for ERISA violations. According to various House and Senate Committee reports, Congress explicitly directed the judiciary to look to the common law of trusts in construing ERISA. 120 Cong.Rec. 29,932 (1974) (statement by Sen. Harrison Williams); *see also* H.R.Rep. No. 533, 93d Cong., 1st Sess. 11 (1973), *reprinted in* 1974 U.S.Code Cong. & Ad.News 4639, 4649–51; S.Rep. No. 127, 93d Cong., 1st Sess. 29m (1973), *reprinted in* 1974 U.S.Code Cong. & Ad. News at 4838, 4865, 4869; 120 Cong.Rec. 29,928, 29,932 (1974) (statement by Sen. Harrison Williams introducing conference report), *reprinted in* 1974 U.S.Code Cong. & Ad.News 5177, 5186.

 Thus, the question becomes whether under traditional principles of trust law, a beneficiary may recover punitive damages against a trustee for breach of trust in cases of extreme fiduciary disloyalty. An exhaustive review of the case law compels us to answer in the affirmative. G. Bogert & G. Bogert, *The Law of Trusts and Trustees* § 862, at 39–41 (rev. 2d ed. 1982) (in suits against "trustees for breach of trust, ... exemplary or punitive damages may be awarded where malice or fraud is involved").[8]

---

**8.** *See, e.g., Ingle v. Allen,* 69 N.C.App. 192, 317 S.E.2d 1, *review denied,* 311 N.C. 757, 321 S.E.2d

In sum, the statute incorporates all forms of relief against an errant fiduciary. Neither the legislative history nor the statute expressly address or preclude an award of punitive damages. Absent an indication Congress intended to limit such relief, and given the plain meaning of the statute and that it reflects both an express desire that a plan obtain complete relief and that fiduciaries be deterred from misconduct in administering the life support assets of America's workers, we hold that punitive damages are an available remedy.

### 3. Analogous to the Landrum-Griffin Act

An examination of the Landrum-Griffin Act, 29 U.S.C. §§ 401–531 (1982), presents additional support for the inclusion of punitive damages under ERISA. Although some "employee protection" statutes have precluded punitive damages, *see, e.g., International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1972) (construing the Railway Labor Act to not permit an employee to recover punitive damages for a union's breach of its duty of fair representation), the Landrum-Griffin Act, a statute most analogous to ERISA, has been construed to include punitive damages. *See Jiminez v. Pioneer Diecasters,* 549 F.Supp. 677, 680–81 (C.D.Cal.1982); *Eaton v. D'Amato,* 581 F.Supp. 743, 747–48 (D.D.C. 1980).

The Landrum-Griffin Act, like ERISA, was designed to protect workers from abuses of organizations that are supposed to serve them. *Compare Bise v. International Brotherhood of Electrical Workers,* 618 F.2d 1299, 1305 n. 5 (9th Cir.1979), *cert. denied,* 449 U.S. 904, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980), *with* 29 U.S.C. § 1001(b) (1982). *See also Eaton v. D'Amato,* 581 F.Supp. at 748. The remedial section of the Landrum-Griffin Act, which bears a striking resemblance to § 409 of ERISA, entitles a "person whose rights ... have been infringed ... to bring a civil action ... for such relief as may be appropriate." 29 U.S.C. § 412 (1982). Despite the fact that the legislative history of the Landrum-Griffin Act, like that of ERISA, is "not at all clear," *Bise,* 618 F.2d at 1305 n. 6, our Court of Appeals has held that "such relief as may be appropriate," encompasses punitive damages. *See Morrissey v. National Maritime Union of America,* 544 F.2d 19, 24–25 (2d Cir.1976) (Friendly, J).

Thus, in light of the similarities between ERISA and the Landrum-Griffin Act, we are further persuaded of our holding that a plan may recover punitive damages.

### 4. Summary

ERISA is a remedial statute that aims to safeguard the rights of workers against the abuses or excesses of institutions that exist to serve them. Undoubtedly, such an act is to be construed "not narrowly as through a keyhole, but in the broad light of the evils it aimed at and the good it hoped for." *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 557, 63 S.Ct. 379, 391, 87 L.Ed. 443 (1943). *See* 3 N. Singer, *Sutherland Stat. Const.* § 60.01 (3d ed. 1974) (remedial statutes are liberally construed

---

135 (1984) (upholding punitive damage award against co-trustees for breach of fiduciary duties); *Dahlborg v. Middleborough Trust Co.,* 16 Mass.App.Ct. 481, 452 N.E.2d 281, 285, *review denied,* 390 Mass. 1103, 454 N.E.2d 1276 (1983) (remanded for determination of whether damages should be doubled or trebled); *Wagman v. Lee,* 457 A.2d 401, 405 (D.C.App.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 158, 78 L.Ed.2d 145 (1983) (punitive damages may be awarded for willful breach of fiduciary duty); *Vale v. Union Bank,* 88 Cal.App.3d 330, 151 Cal.Rptr. 784 (1979) (punitive damages may be awarded where trustee breaches fiduciary duty); *Adam v. Harris,* 564 S.W.2d 152, 156 (Tex.Civ.App. 1978) (trustee guilty of conversion assessed punitive damages); *Estate of Rothko,* 43 N.Y.2d 305, 372 N.E.2d 291, 407 N.Y.S.2d 954 (1977) (punitive surcharge assessed against fiduciaries found guilty of self-dealing); *Gould v. Starr,* 558 S.W.2d 755 (Mo.App.1977) (decedent's lawyer acting as executor and trustee assessed punitive damages); *Jones v. Morrison,* 62 Tenn.App. 50, 458 S.W.2d 434 (1970) (Punitive damages granted); *Rivero v. Thomas,* 86 Cal.App.2d 225, 194 P.2d 533, 542 (1948) (punitive damages for misuse of trust funds granted); *Sharts v. Douglas,* 94 Ind.App. 201, 163 N.E. 109, 112 (1928) (same); *see also* Smith, *Remedies in Surcharge Action,* 16 Real Prop., Prob. & Tr.J. 775 (discussion of punitive damage awards against trustees). *But cf. Sommers,* 793 F.2d at 1463 ("trustees generally are not liable for punitive damages for breach of fiduciary duty").

to suppress the evil and advance the remedy).

Viewed in this light, we see no justification for ruling as a matter of law that a plan may not recover punitive damages under appropriate conditions because Congress did not explicitly set forth such a remedy in the statutory text. This is especially so given Congress's expressed desire "that a body of Federal substantive law ... be developed by the courts to deal with the issues involving rights and obligations under private ... pension plans." 120 Cong.Rec. 29,942 (1974) (statement by Sen. Jacob Javits). Hence, we believe the recovery of punitive damages from a fiduciary by a plan "is fully consistent with ERISA, and will further the express policy of ERISA to protect the interests of plan participants and beneficiaries by deterring fiduciary misconduct." *Jiminez,* 549 F.Supp. at 679.

### B. Punitive Damages in the Present Case

Once the legal predicate for punitive damages is established, their imposition is discretionary with the trier of fact. *Winterrowd v. David Freedman & Co., Inc.,* 724 F.2d 823, 826 (9th Cir.1984). This discretion is to be exercised only where there is "a showing of wanton or malicious conduct." *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1043 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1189, 89 L.Ed.2d 304 (1986).

We need not repeat the findings of fact and conclusions of law already quoted concerning the wilfulness of defendants' conduct and the blind self-interest that motivated them to the exclusion of any concern for the welfare of those that they had the duty to protect. Such reprehensible, illegal conduct we have positively found as a matter of fact. *See* our opinion filed on February 14, 1986.

■ The main theory in support of the punitive award is that it will operate to punish and to set an example that will deter similar conduct in the future. *Restatement of Torts* § 908, comment a (1939). Naturally a determination of

whether to make an award turns on the extent to which a grant fulfills or exceeds these purposes. Thus we must consider, *inter alia,* the amount of actual damages recovered, the relative wealth of the particular defendants as well as their standing or social position, the particular nature of the defendants' acts and the possibility of those acts being repeated in the future.

We entertain no doubt whatever that we clearly have the power to award punitive damages in this case. The misconduct of the defendants overwhelmingly warrants the imposition of substantial punitive damages.

■ After considerable reflection, we have concluded that in our opinion the better part of wisdom dictates that for the following reasons to impose punitive damages here would be tantamount to a draconion penalty: 1) our opinion heretofore filed on February 14, 1986 denounces without reservation the callous and cruel disregard by each defendant of the pension rights of employees and their families. Simply put, their misconduct is now a matter of public record, a stigma that attaches to them by reason of the highly critical judicial appraisal of their misconduct made public. 2) The appropriate heavy compensatory damages and attorneys fees imposed. *See* 22 Am.Jur.2d *Damages* § 265 (1965) (punitive damages should not be imposed where compensatory damages are adequate to punish the defendant).

Accordingly, plaintiff's request for punitive damages is denied.

### CONCLUSION

In view of the foregoing we are constrained to, and do, find defendants jointly and severally liable to the plaintiff for damages in the following amounts: (i) compensatory damages in the amount of $458,-961.00 with interest thereon from April 1, 1984; and (ii) costs and attorneys' fees in the amount of $404,101.33. In addition, defendants are jointly and severally liable to Doctors Essman, Pagliaro and Schoen-

holtz (individually) for attorneys' fees in the amount of $34,762.50.

SO ORDERED.