**Charles LEIGH and Ervin Dusek, Plaintiffs,**

**Estate of George Johnson, et al., Intervening Plaintiffs,**

v.

**Clyde W. ENGLE, et al., Defendants.**

No. 78 C 3799.

United States District Court,
N.D. Illinois, E.D.

Aug. 27, 1987.

Ware Adams, Chicago, Ill., for plaintiffs.

Richard C. Moenning, Morton Denlow, Dardick & Denlow, William D. Heinz, Jenner & Block, Chicago, Ill., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

This action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461 accuses defendants of misusing the assets of an employees' profit-sharing trust. Defendants allegedly invested a substantial portion of the trust's assets in three speculative stocks for the purpose of enhancing their own investments in those stocks, and delayed distribution of trust assets to beneficiaries in order to profit by prolonging their control of the trust's stock holdings.

Plaintiffs and intervening plaintiffs (collectively, "plaintiffs") are vested beneficiaries of the trust, which is subject to ERISA. There are five defendants: Nathaniel Dardick and Ronald Zuckerman, the trust's two administrators; Libco Corp. ("Libco"), which owned 100 percent of Reliable Manufacturing Co. ("Reliable"), the company that sponsored the trust and had direct authority to appoint and retain its administrators; Clyde Engle, who controlled at least 49 percent of Libco's stock and was chairman of its board of directors; and National Boulevard Bank ("National Boulevard"), the trustee of the Reliable trust.

Defendants prevailed in a 1982 trial before Judge George Leighton. The Seventh Circuit vacated and remanded, *Leigh v. Engle*, 727 F.2d 113 (7th Cir.1984), and in so

doing resolved numerous factual and legal issues. Of particular importance to this proceeding are the Seventh Circuit's conclusions that Dardick and Zuckerman breached their fiduciary duties to the trust by investing its assets as they did, 727 F.2d at 132, and that Libco and Engle were fiduciaries of the trust to the extent they were responsible for selecting, retaining, and supervising the trust's administrators, 727 F.2d at 133, 135–36.

The Seventh Circuit's opinion left four issues for resolution in a second trial:

1. Did Libco and Engle breach their fiduciary responsibilities by inadequately supervising Dardick's and Zuckerman's investment activities, in light of Libco's and Engle's knowledge that Dardick and Zuckerman faced conflicting loyalties in investing trust assets?

2. What, if any, restitution is due the trust from those defendants found to have breached their fiduciary duties with respect to investment of the trust's assets?

3. Did Dardick, Zuckerman, and the National Boulevard Bank breach their fiduciary duties to the trust by delaying distribution of its assets, and did Libco and Engle breach their fiduciary duties by failing to supervise Dardick, Zuckerman, and the National Boulevard Bank in this regard? If so, what restitution is due?

4. Must defendants restore to the trust money used to pay their attorneys' fees during this litigation, and should the court award attorneys' fees to either party under 29 U.S.C. § 1132(g)(1)?

In addition, plaintiffs have raised a fifth issue which was not before either Judge Leighton or the Seventh Circuit:

5. Should the court assess punitive damages against those defendants found to have breached their fiduciary duties?

 The parties tried these issues to the court on 14 full trial days from July 21 to

August 6, 1986, and the court now makes its findings of fact and conclusions of law. Before proceeding, however, two preliminary comments are in order. First, the Seventh Circuit made detailed findings of fact from the record on appeal. Those findings, which the court repeats only where necessary, form the starting point for this court's decision. Second, the final line of the Seventh Circuit's opinion reads "Vacated And Remanded." The parties disagree about whether this vacates Judge Leighton's findings of fact in their entirety, or vacates only those findings of which the Court of Appeals specifically disapproved. Resort to a dictionary settles the matter. To "vacate" comes from the Latin verb *vacare* for "be empty," and means to annul or leave empty. *Webster's Third New International Dictionary,* 2527 (1981). *Accord, Black's Law Dictionary,* 1388 (5th ed. 1979). Because Judge Leighton's findings of fact have been "left empty," they have no continued vitality except insofar as the Seventh Circuit may have adopted certain findings and made them their own.

## I. BREACH OF FIDUCIARY DUTY BY LIBCO AND ENGLE

*A. Findings of Fact*

1. Reliable's board of directors, which included Engle and George Contarsy, Libco's president, appointed Dardick and Zuckerman administrators of the Reliable Employees Profit-Sharing Trust. Before the Reliable board did so, neither Engle nor Contarsy nor any other member of either Reliable's or Libco's board made any inquiry into Dardick's or Zuckerman's experience with the administration of profit-sharing trusts, or into their knowledge of ERISA. Engle L–316–17; Contarsy L–427.[1] So far as Engle and Libco knew, Dardick and Zuckerman had no such experience or knowledge. *Id.*

---

1. The court uses the following abbreviations in citing to the record: (1) a name followed by page numbers refers to the transcript of testimony at this trial; (2) a name followed by "L", followed by page numbers refers to the transcript of the trial before Judge Leighton; (3) DX and PX refer to defendants' and joint plaintiffs'- intervenors' exhibits; L–DX and L–PX refer to defense and plaintiff-intervenor exhibits originally admitted in the trial before Judge Leighton; P1X and IntX refer to exhibits in this trial offered solely by plaintiffs or intervening plaintiffs.

2. Neither Dardick nor Zuckerman received pay for their services as trust administrators, but both received substantial income from other activities related to Engle's business endeavors. 727 F.2d at 117; Zuckerman at L–442–44.

3. At the direction of Dardick, who made all investment decisions for the Reliable trust, 727 F.2d at 117, PX 149 at 27, the trust purchased 15,800 shares of Berkeley Bio Medical, Inc. ("Berkeley") for a total of $71,480 between March 17 and March 21, 1978. PX 427. The trust also purchased 12,500 shares of Outdoor Sports Industries, Inc. ("OSI") at a cost of $77,734 between March 22 and April 11, 1978. Id. In addition, the trust purchased 8,000 shares of Hickory Furniture Co. ("Hickory") for $43,000 on March 22, 1978, and 4,000 more shares for $29,433 on June 9, 1978. Id. The total cost of the Berkeley, OSI, and Hickory purchases was $221,647, and represented approximately 30 percent of the trust's assets. Id.; 727 F.2d at 118. The trust never bought more stock in these companies.

4. Engle and persons and entities with whom he maintained business affiliations (collectively, "the Engle group") made substantial investments in Berkeley, OSI, and Hickory beginning before and continuing after the trust's purchases of stock in those three companies. PX 427, DX 600 at Ex. D–F. The Engle group eventually acquired 10.7 percent of Berkeley, 22 percent of OSI, and a majority of Hickory. 727 F.2d at 119 n. 10. Prior to the start of the trust's purchases, the Engle group owned 95,220 shares of Berkeley, bought for approximately $476,500; 9,000 shares of OSI, bought for $41,359; and 50,400 shares of Hickory, bought for $258,001. PX 427. Because of his roles as Engle's personal counsel and general counsel of Libco, Dardick was aware of most if not all of these holdings by members of the Engle group, 727 F.2d at 117, 130–31, and Engle correspondingly was aware of Dardick's knowledge.

5. Dardick did not invest trust assets in Berkeley, OSI, and Hickory solely for the purpose of creating an investment portfolio to benefit the trust; rather, he did so at least partly to aid the Engle group's stock acquisition program. 727 F.2d at 129–31. While Dardick's motives for investing trust assets as he did are impossible to divine completely, the evidence suggests that a variety of factors besides his desire to aid the Engle group's program may have entered into his decisions: a genuine belief that Berkeley, OSI, and Hickory were good investments, see PX 410; Newbill L–671–75; Zuckerman 477–78, 513; his desire as a young and ambitious lieutenant to emulate Engle's investment strategy; and the ready availability of Newbill's investment advice, which eliminated the need to search out an independent investment counselor, see Dardick L–816–17.

6. Engle and Libco knew of the trust's investments no later than April 21, 1978, when Engle disclosed them at a board meeting of Telco Corp. ("Telco"). Engle 842; 727 F.2d at 118. Libco owned 64 per cent of Telco at the time, and Engle was Chairman of the Board of each company. 727 F.2d at 116. Once they learned that the trust had purchased stocks in which the Engle group was acquiring substantial interests, Engle and Libco knew of a conflict between Dardick's responsibility to invest trust assets solely for the gain of the beneficiaries, and his duty to act in the best interest of his superior.

7. Despite this evident conflict of interest, which persisted until the trust sold its shares of OSI on June 26, 1979 (the trust disposed of its Berkeley and Hickory shares earlier), neither Engle nor any other Libco official ever questioned Dardick's decision to invest a total of 30 percent of the trust's assets in Berkeley, OSI, and Hickory. Engle L–266; Contarsy L–432–35. There is no evidence that Engle or any other Libco official ever requested reports from Dardick and Zuckerman on the nature of the trust's investment policy, ever reminded them of their responsibilities as fiduciaries under ERISA, ever asked whether they considered investing in stocks other than the targets of Engle's investment program, ever sought an independent review of their investment decisions, or ever sug-

gested or even contemplated replacing them with independent administrators.

### B. *Conclusions of Law*

■ 1. Engle and Libco were fiduciaries of the trust "with respect to the selection and retention of the plan administrators," 727 F.2d at 134, and "[a]s the fiduciaries responsible for selecting and retaining their close business associates as plan administrators, Engle and Libco had a duty to monitor appropriately the administrators' actions," *id.* at 135. This obliged Engle and Libco "to take prudent and reasonable action to determine whether the administrators were fulfilling their fiduciary obligations." *Id.*

2. Engle and Libco did not take reasonable action to ensure that Dardick and Zuckerman were fulfilling their fiduciary obligations. Engle and Libco knew of, but chose to ignore, Dardick's and Zuckerman's pursuit of a speculative investment policy which risked the trust's assets while at a minimum creating the appearance of serving Engle's and Libco's own business interests. Accordingly, the court concludes that both Engle and Libco breached their fiduciary duties to the trust.

## II. RESTITUTION FOR INVESTMENT OF TRUST ASSETS

### A. *Findings of Fact*

1. When it sold its shares in Berkeley after holding them approximately five months, the trust made a profit of 66 percent on its investment of $71,581. 727 F.2d at 119; DX 600 at Ex. D. The trust sold its shares in OSI after approximately 15 months for a profit of 141 percent on its investment of $77,737. 727 F.2d at 119; DX 600 at Ex. E. The trust sold its Hickory shares after holding them an average of

approximately seven months, and made a profit of four percent on its investment of $72,433. 727 F.2d at 119; DX 600 at Ex. F. The trust's aggregate return on these three investments was 72 percent. 727 F.2d at 119.

■ 2. The amount of restitution, if any, due the trust as a result of its investments in Berkeley, OSI, and Hickory has two components: (a) the trust's actual losses from these investments; and (b) the breaching fiduciaries' profits attributable to those investments.[2] DX 600 at 3.

### *Losses to the Trust*

3. The parties dispute whether the court should view the trust's investments in Berkeley, OSI, and Hickory individually or as a portfolio for the purpose of determining whether the trust lost money by investing in those stocks. All parties agree that if the court views the trust's stock investments in the aggregate, the trust suffered no loss because its return of 72 percent substantially exceeded what it could have earned through prudent alternative investments. All parties also agree that if the court views each stock separately, the trust suffered no losses on its investments in Berkeley and OSI, but did suffer a loss on its investment in Hickory because other prudent investments would have produced a return in excess of four percent.

4. Defendants' expert witness, Daniel Fischel,[3] testified that the court should consider the three stocks together because they constitute a portfolio. Fischel 652–53; DX 600 at 6. According to Fischel, the trust's beneficiaries care only about the total return on their investment, not about the return on each component stock, or about whether the portfolio is diversified. *Id.* Fischel's testimony on this issue is

---

**2.** Since the breaching fiduciaries' profits are interwoven with those of the Engle group as a whole, the portion of the court's decision addressing the issue of restitution considers the broader and simpler question of whether *any* Engle group member profited from the trust's investments. The court's conclusion that no Engle group member profited from the trust's investments makes it unnecessary to separate the profits of Dardick, Zuckerman, Libco, and

Engle from those of the other Engle group members.

**3.** Fischel is a professor of law and director of the Law and Economics Program at the University of Chicago Law School. He has published extensively on corporate finance and the securities markets.

consistent with that of another expert witness for defendants, Gil Matthews, an investment banker who is a managing director of Bear, Stearns & Co. Like Fischel, Matthews testified that it is appropriate to consider the three stocks together for the purposes of calculating the amount of restitution due the trust. Matthews 2005–06. Investors will always prefer a portfolio which returns an aggregate of 72 percent but includes one stock returning only four percent, to a fully diversified portfolio in which every stock returns 14 percent, Fischel and Matthews suggest.

5. Plaintiffs' expert witnesses, Joel Stern and Laurence Siegel,[4] testified that the court should consider the returns on the trust's investments in Berkeley, OSI, and Hickory individually because a portfolio consisting only of stocks in three small companies is so undiversified that the stocks simply represent individual purchases. Siegel 1470–72; PX 412 at 11.

6. Lee Meyer, a former trust administrator at Harris Trust and Savings Bank ("Harris") in Chicago, testified that although Harris manages, among others, a fund comprised primarily of highly-speculative stocks issued by small companies, the bank refuses to allow profit-sharing trusts or pension plans to invest more than five percent of their assets in this fund. Meyer L–5–61. Charles Brickman, an investment banker with Kidder Peabody & Co. for 23 years, testified that OSI stock was not an appropriate investment for a profit-sharing trust because OSI's small size and erratic earnings history rendered the stock speculative. Brickman L–517–20. No witness testified that a portfolio consisting solely of stock in Berkeley, OSI, and Hickory would have been diversified. The court finds that the trust's investments in Berkeley, OSI, and Hickory were undiversified and highly speculative.

8. Fischel testified that if the court decides to view the Hickory investment individually, it should assess damages to the

trust from that investment by calculating the additional profit the trust would have earned had it made any of three prudent alternative investments. According to Fischel, instead of investing a total of $72,433 in Hickory stock in March and June, 1978, and selling it for a four percent profit in March, 1979, the trust could have invested the same amount: (a) in Harris Bank's Investment Reserve Fund (in which the trust's non-stock assets were invested), for an additional profit of $2,109; (b) in Harris Bank's Common Stock Fund, for an additional profit of $3,747; or (c) divided equally among all of Harris Bank's common stock funds, for an additional profit of $6,704. DX 600 at Ex. B.

9. Gil Matthews testified that he measured the performance of the trust's Hickory investments against three alternative financial standards for the purpose of assessing the trust's losses from those investments: (a) long-term debt securities, which indicate no loss by the trust since Hickory stock outperformed the market for long-term debt securities while the trust owned the stock; (b) 12–month Treasury bills, which indicate a loss by the trust of $800; and (c) a general stock market index, which indicates a loss of approximately $2000. Matthews at 2010–12.

10. Stern stated that a fair return on stocks as risky as Berkeley, OSI, and Hickory would have been between 20 and 30 percent annually. Stern 1001; PX 412 at 11. If the trust had earned a 30 percent annual return on its Hickory investment its profits would have been $15,983 greater than they actually were. DX 600 at Ex. B. Neither Stern's testimony nor any other evidence suggests how the trust could have achieved such a high rate of return through any prudent investment.

### Gains to the Engle Group
### Berkeley

11. Plaintiffs suggest a series of ways in which the Engle group might have prof-

**4.** Stern is managing partner of Stern Stewart & Co., a New York firm that provides financial advice to industrial companies, banks, and large accounting firms. He is an adjunct professor at Columbia University's Graduate School of Business, has previously served as president of Chase Financial Policy, a division of the Chase Manhattan Bank, and is a rotating panelist on the Wall Street Week television program. Siegel is a self-employed financial consultant.

ited from the trust's investments in Berkeley, OSI, and Hickory. With respect to Berkeley, they contend that the trust's purchases benefited the Engle group because (a) the trust bought its Berkeley stock when the Engle group needed to acquire control of additional shares but lacked the cash to do so; (b) the trust's purchases affected Berkeley's stock price; (c) Cooper Laboratories, Inc. ("Cooper") would not have purchased the Engle group's Berkeley stock at a premium unless the trust had agreed to sell its stock to Cooper. Plaintiffs also assert that the Engle group recycled profits from the trust's Berkeley purchases into new and remunerative investments in OSI and Hickory. PX 412 at 7–8. None of these theories has merit.

12. Plaintiffs' first argument is that the Engle group turned to the trust as a means of gaining control over additional shares of Berkeley because in the spring of 1978 no other Engle group member could spare the $71,480 which the trust invested. This argument is plausible only if the Engle group could not wait to gain control of the 15,800 Berkeley shares that the trust purchased; if there was no urgency in the Engle group's acquisition of voting control over those shares, the Engle group would have been better off purchasing the shares in its own name once it accumulated enough money to do so, since profits on those shares then would accrue to the Engle group rather than to the trust.

13. Even assuming it was important for some Engle affiliate to gain control of 15,800 shares of Berkeley stock between March 17 and March 21, 1978—an assumption for which there is not a shred of evidence—it is nonsense for plaintiffs to claim that the Engle group was short of cash during this period and therefore turned to the trust as a source of purchasing power. The evidence establishes that the Engle group had ample funds available to buy Berkeley stock in the spring of 1978, had it desired to do so.

14. On December 31, 1977, Libco had total assets of approximately $48 million. DX 601 at 48. The company had excess funds during 1977 and 1978. Engle 1838.

The book value of Telco in 1978 was approximately $11 million, *id.* at 1840, and it was able to retain "a substantial part" of monthly income in excess of one million dollars from a leasing portfolio, *id.* at 1838. Another member of the Engle group, GSC Enterprises, Inc., had assets in excess of $109 million as of September, 1978. DX 612. The record lacks detailed financial information about other members of the Engle group, but every indication is that at least two of them—Sierra Capital Group, and Engle himself—had assets that were substantial and separate from Libco's and Telco's assets. *See* IntX 430.

15. On April 17, 1978, Telco announced it had completed a refinancing of certain debts. PX 72 at CR 28–30. Engle informed Telco's board of directors at a meeting on April 21, 1978 that as a result of this refinancing Telco had approximately $2 million in cash available for immediate use. PX 59 at CR 3. On Engle's recommendation the board then authorized Telco's management to purchase up to 200,000 shares of Berkeley at a price not to exceed $6.50 per share; up to 140,000 shares of OSI at a price not to exceed $10.00 per share; and up to 120,000 shares of Hickory at a price not to exceed $5.00 per share. *Id.* at CR 5–6.

16. Fischel testified that many sources of capital were available to the Engle group at the time of the trust's stock purchases, including retained earnings, the capital markets, the partnership market, and personal wealth. Fischel 1754; *accord* Matthews 2032. Even plaintiffs' own expert conceded that $75,000 was a "mere pittance" to a company with assets of $50 million, Stern 638–39, and that members of the Engle group might have been able to come up with capital to acquire an additional $75,000 worth of Berkeley stock in the spring of 1978 if doing so had been important to their investment program, *id.* at 628–29. In the face of this evidence the court finds it inconceivable that the Engle group was so strapped for cash in February, March, and April, 1978 that the only way it could gain control of $71,480 worth of Berkeley stock was through use of the trust's assets.

17. Plaintiffs' second argument for attributing the Engle group's profits to the trust's investments in Berkeley is that the trust's purchases pushed up the price of Berkeley stock, thereby inflating the value of the Engle group's shares. Oblivious to logic, plaintiffs also make the opposite argument: that the trust's purchases benefitted the Engle group by *preventing* Berkeley's stock price from rising. Both arguments are wrong. The evidence demonstrates that the trust's purchases had at most a negligible effect on Berkeley's stock price.

18. Berkeley's stock price was essentially flat from February 28 to April 17, 1978, a period extending more than two weeks before and three weeks after the trust's purchases. DX 600 at Ex. D.

19. Fischel studied the effect of the trust's purchases on Berkeley's stock price by examining daily changes in the value of Berkeley stock from January 3 to August 31, 1978. He compared the "actual return" from holding a Berkeley share for each market day (taking into consideration changes in the stock price as well as any dividends distributed that day) to the "expected return" from holding a share of stock in a typical company of Berkeley's size and industry for the same day. Fischel 1642–43; DX 600 at 15–16, Ex. D.

20. This analysis, which plaintiffs do not challenge, demonstrates that on the dates of the trust's Berkeley purchases, and on the several days immediately following, there was never any statistically significant difference between the actual return from holding a Berkeley share and the return which would have been expected by someone holding a share of stock in a comparable company. DX 600 at Ex. D, G. Fischel stated that statisticians view a result as statistically significant if the probability of obtaining it by chance is less than five percent, and that he relied on this standard in preparing his analysis. *Id.* at Ex. G. In simpler terms, Fischel's study establishes the absence of any scientifically reliable link between the trust's purchases and changes in Berkeley's stock price.

21. Fischel's analysis also establishes the absence of any statistically significant price movement on or about the date that Telco's Schedule 13D filing provided the first public disclosure of the trust's purchases. *Id.* at Ex. D.

22. According to Fischel, numerous academic studies have found that stock prices react almost instantaneously to newly available information about a stock. PX 600 at 16. The absence of any statistically significant changes in Berkeley's stock price within several days of the filing of Telco's Schedule 13D therefore suggests that public disclosure of the trust's purchases did not affect the stock price.

23. A look at a graph of Berkeley's day-to-day stock price changes, DX 635, offers a means of gauging the market impact of the trust's purchases and their subsequent public disclosure that is less reliable but more sensitive than Fischel's approach. Fischel's analysis detects only stock price variations so large they almost certainly are not random, while a graph can reveal relationships which, though not statistically significant, are nonetheless real. The graph shows that Berkeley's stock price was almost flat from early February through early June, 1978. In fact, the stock price was *most* stable during the two-week period when the trust purchased its shares. *Id.* The stock price did increase slightly (from $4.625 to $5.000) in the five trading days after Telco filed its Schedule 13D, but it is impossible to attribute this increase to disclosure of the trust's purchases, since Telco bought a total of 35,200 shares during the same five-day period, *id.*, and those purchases would have tended to drive the stock price up if they had any effect at all, *id.* at 9.

24. Even if plaintiffs were correct that the trust's purchases of Berkeley shares drove the company's stock price up, such an increase would not have benefitted the Engle group. Of the total number of shares it accumulated before selling them, the Engle group acquired substantially more than half after the trust completed its purchases and Telco filed its Schedule 13D. PX 427, DX 600 at Ex. D. Any increase in

the price of Berkeley stock attributable to the trust's purchases thus would have harmed the Engle group by forcing it to pay more for the shares it subsequently acquired. Fischel 1701.

25. The court rejects plaintiffs' alternative theory that the trust's purchases aided the Engle group by prolonging the secrecy of its acquisition program, thereby enabling members of the group to accumulate additional shares before disclosure of the program triggered a price increase. Even assuming that disclosure of the Engle group's activities did cause Berkeley's stock price to rise—a dubious assumption since the evidence shows there was no meaningful market reaction to Telco's Schedule 13D filing—Telco included the trust's Berkeley shares in calculating the trigger point for its duty to file a Schedule 13D, PX 76, so the trust's purchases could not have allowed Telco to delay disclosure of the Engle group's acquisition program. Fischel 1662–64; DX 600 at Ex. C.1.

26. As their third reason for attributing the Engle's group's profits to the trust's investments in Berkeley, plaintiffs argue that Cooper would not have agreed to purchase the Engle group's stock at a premium unless the trust agreed to sell its stock as part of the deal. An examination of the evidence concerning the Cooper transaction demonstrates that plaintiffs are wrong.

27. On August 18, 1978, the trust and the Engle group members that had purchased shares in Berkeley entered into a written agreement with Berkeley, Cooper, and certain officers and directors of those two companies. This agreement settled litigation by Engle group members against Berkeley, Cooper, and their officers, and provided that Cooper would purchase for $7.50 per share all Berkeley stock held then held by Engle group members and the trust. PX 78; PX 59 at CR 20. The market price of Berkeley stock at the time was between $5.00 and $6.00 per share. DX 635. The agreement obligated Cooper to pay a total of $1,944,150 to the trust and members of the Engle group. Less than one-sixteenth of this amount—$118,500—was for shares held by the trust. PX 258.

28. The agreement required every Engle affiliate that had owned Berkeley stock after August 1, 1975, including the Reliable trust, to: (a) sell all of its Berkeley stock to Cooper for $7.50 per share; (b) agree not to object to, or encourage others to object to, Berkeley's sale of its assets or repurchase of its shares prior to July 1, 1979; (c) release all causes of action against Berkeley, Cooper, and their officers and directors; and (d) refrain from acquiring any Berkeley or Cooper stock prior to July 1, 1979. PX 78. The agreement did allow Engle to acquire "a limited number" of Berkeley shares in his own name after January 1, 1979. *Id.* at 16.

29. Although the trust was a party to the settlement agreement, it was not a party to any of the underlying litigation, and never paid or was assessed any portion of the legal fees for conducting that litigation. Engle L–320, 330; Engle 1831; PX 410 at 4.

30. No witness from Cooper or Berkeley testified about whether those companies would have settled with the Engle group had the Reliable trust been unwilling to tender its shares. Both plaintiffs and defendants did offer expert opinion testimony on this issue, however. Stern testified that it is virtually unheard of for targets of hostile takeover attempts to buy out the stock of hostile shareholders at a premium unless the company regains control of all hostile shares and receives a long-term "hands-off" promise from the aggressor. PX 412 at 8. According to Stern, because Berkeley management considered the Engle group's shares hostile, and because the trust's shares were subject to Engle's control, Berkeley would not have settled with the Engle group and paid a premium for its shares unless the trust relinquished its holdings. *Id.;* Stern 472.

31. Like Stern, Siegel testified that Cooper would not have agreed to purchase the Engle group's Berkeley stock at a premium unless it could acquire all shares under the Engle group's control, including those held by the trust. Siegel 1453–54. Siegel based his opinion on a belief that companies will only consummate "selective repurchase

agreements" with shareholders hostile to management if the purchasers are certain of acquiring all shares under the control of the hostile group. *Id.* Siegel admitted under cross-examination, however, that a shareholder such as the trust which controlled less than one percent of a company's stock, displayed no intention of buying additional shares, and had not participated in any litigation against the company, would not constitute such a threat to management that the shareholder could command a premium for the sale of its stock. *Id.* at 1535–36.

32. Fischel testified that Cooper had no reason to insist on buying the trust's shares along with the shares of other Engle group members. According to Fischel, if every Engle group member except the trust tendered its shares and signed a hands-off agreement, the trust's resources would be too small to threaten Berkeley management and endanger the purposes of the settlement agreement. DX 600 at 12–14, 27–29; Fischel 1689–92. Matthews likewise testified that the trust's holdings of Berkeley stock were so small they posed no threat to Cooper. Matthews 2019. Moreover, he added, the trust was not a party to the litigation involving Berkeley and Cooper, and lacked the assets to buy a material amount of Berkeley stock. *Id.* Matthews testified that Cooper would have paid the Engle group the same price for its Berkeley stock regardless of whether the trust sold its shares as part of the agreement, and that had he been advising Cooper management he would have counseled it not to insist on acquiring the trust's shares. *Id.* at 2017–20.

33. Fischel identified four factors as responsible for Berkeley's and Cooper's fear of the Engle group, and ultimately for Cooper's willingness to pay a premium to buy out the Engle group's holdings: (1) Engle's reputation for engaging in hostile takeovers, coupled with Telco's statement in its Schedule 13D that it might seek control of Berkeley in the future; (2) the Engle group's ownership of more than 10 percent of Berkeley's stock; (3) the Engle group's access to capital for further acquisitions; and (4) the lawsuits filed by members of

the Engle group. Fischel 1679–80. The court finds Fischel's analysis credible, as it does his observation that the trust's investments were irrelevant to each factor. *Id.*

34. There is no evidence any member of the Engle group ordered or urged Dardick to sell the trust's Berkeley stock in conjunction with the Engle group's settlement agreement with Cooper. Minutes of directors' meetings of Telco, Telvest, and Libco suggest those companies' directors never discussed whether the trust should sell its shares pursuant to the settlement agreement. PX 59 at CR 13–24; PX 60 at 2679–86; PX 305–06. Engle L–320–21. Moreover, Engle testified that when he negotiated the price Cooper would pay for the Engle group's Berkeley stock, the parties to the negotiations did not contemplate including the trust's shares in the purchase agreement. Engle 1830–31, 1878. *See also id.* at 853. The question of the trust's participation arose only after the price had been set, when Dardick asked Cooper to buy the trust's shares. *Id.* at 1830–31; PX 410 at 4. The court considers Engle's testimony on this issue credible, and finds that Cooper did not insist on purchasing the trust's stock, but acquired it only at Dardick's request.

35. This finding is consistent with Fischel's and Matthews' analysis of the Cooper-Engle group transaction, which is more persuasive than the analysis by plaintiffs' experts. So long as Cooper and Berkeley could extract a promise from Engle not to interfere with their planned transactions and not to give the trust access to funds for its own takeover attempt—promises Engle had no reason to withhold and a strong financial incentive to make—Cooper and Berkeley could not fear the trust.

36. Regardless of whether the trust could have scuttled the agreement among Berkeley, Cooper, and the Engle group by refusing to participate, it had no reason to do so. The agreement left the trust with a profit of 66 percent on its Berkeley holdings. PX 78; PX 258. It was not in the trust's interest to reject a premium of approximately $1.50 per share above the market price and retain its substantial invest-

ment in Berkeley. Fischel 1689. Indeed, particularly because that investment was speculative and inadequately diversified, Dardick's decision to rid the trust of the investment was justifiable.

37. If it is not already apparent, this is an appropriate place to note that the court found Fischel, defendants' principal expert witness on the issue of whether the Engle group profited by the trust's stock investments, an extraordinarily able witness in terms of the depth and breadth of his understanding of this case. The court finds his testimony highly credible and persuasive. By contrast, plaintiffs' principal expert witness, Stern, was less knowledgeable about the events underlying this litigation, and his testimony attributing the Engle group's profits to the trust's stock investments rested primarily on unsubstantiated speculation.

38. The evidence demonstrates that the trust's investments in Berkeley enabled Engle group members neither to acquire shares at a lower price nor to sell shares at a higher price than would otherwise have been possible. *See* Fischel 1661. Because the Engle group did not profit from the trust's investments in Berkeley, it could not have gained by recycling its profits into OSI and Hickory. Accordingly, the court finds that Engle, Libco, Dardick and Zuckerman did not profit from their breaches of fiduciary duty with respect to the trust's investments in Berkeley.

### OSI

39. With respect to OSI, plaintiffs argue that the Engle group profited from the trust's purchases because (a) they affected the stock price; (b) they led OSI's management to seek out a "white knight" willing to acquire the company's shares at a premium; and (c) the Brown Group, Inc. ("the Brown Group") would not have made its tender offer for OSI shares unless it had expected the trust to sell its shares. Plaintiffs also claim that the Engle group used profits attributable to the trust's OSI investments to acquire stock in Hickory. PX 412 at 9–10.

40. The first of plaintiffs' arguments— that the trust's investments in OSI benefited the Engle group by increasing (or decreasing) the price of OSI's stock fails for the same reasons as their similar argument with respect to Berkeley. The evidence shows that the trust's purchases did not increase the price of OSI stock, and that even if it did, such an increase would have hurt rather than helped the Engle group. The evidence also shows that the trust's purchases did not enable the Engle group to delay the filing of a Schedule 13D and acquire OSI stock at depressed prices.

41. As he did with Berkeley, Fischel prepared a chart comparing the daily return on OSI stock with the expected daily return on stock in comparable companies. His study establishes the absence of any statistically significant changes in the price of OSI stock on or immediately after any of the five dates when the trust purchased 12,400 of its 12,500 shares—March 22, 1978, when the trust purchased 1400 shares; March 23, when it purchased 2500 shares; March 29, when it purchased 2100 shares; March 30, when it purchased 1500 shares; and March 31, when it purchased 4900 shares. DX 600 at Ex. E; PX 259. Fischel's study also finds no statistically significant change in OSI's stock price on any of the five trading days after Telco publicly disclosed the trust's OSI holdings by filing a Schedule 13D. DX 600 at Ex. E. Fischel's study is careful and detailed in this respect, and the court accepts its conclusions as accurate.

42. Fischel did find a statistically significant change in OSI's daily return on April 11, 1978, when the trust purchased its final 100 shares of OSI, and on the following day, April 11. *Id.* OSI's stock traded at $6.750 on April 10, $7.375 on April 11, $7.875 on April 12, and $7.750 on April 13. *Id.* Although Fischel's study offers no explanation for this jump in the stock price, the court finds it impossible to suppose the trust's purchase of a paltry 100 shares had anything to do with it—particularly when earlier and much larger purchases by the trust had no discernable impact on OSI's stock price.

43. Examination of a graph of OSI's stock price between March 1, 1978 and July 2, 1979 adds nothing to Fischel's statistical analysis. OSI's stock price rose only slightly (from $5.875 to $6.250, DX 600 at Ex. E) over the course of the trust's first five purchases, and the trust's final, negligible purchase came roughly in the middle of a weeklong run-up of the stock price. DX 636. The chart also fails to show any unusual stock price movement around the time Telco filed its Schedule 13D. *Id.*

44. By the last of the trust's purchases of OSI stock on April 11, 1978, the Engle group had acquired less than ten percent of the OSI stock it would eventually buy. Fischel 1696; PX 259. Even if the trust's investments in OSI had increased the market price of OSI stock—a proposition the court rejects—such an increase therefore would have harmed rather than helped the Engle group.

45. The trust's OSI purchases did not enable the Engle group to prolong the secrecy of its acquisition program by delaying the filing of a Schedule 13D, since members of the Engle group counted the trust's shares with their own in determining when their holdings were sufficiently large to trigger the filing requirement. DX 600 at Ex. C; Siegel 1555–56.

46. Plaintiffs' remaining arguments linking the Engle group's OSI profits to the trust's investments are that the trust's purchases prompted OSI management to seek a "White Knight," and that the Brown Group would not have made its tender offer for OSI stock unless it expected the trust to tender its shares. Both arguments are groundless.

47. OSI management did not regard the Engle group as hostile until well after the trust completed its purchases. Engle and investment consultant Charles Newbill visited OSI's Denver headquarters in early May, 1978 and met with the company's management to discuss Engle's interest in investing in OSI. 727 F.2d at 120; Engle L–201; Newbill L–687. This encounter was friendly, Newbill L–687, and in a cab ride to the airport at the end of the visit Engle informally asked OSI's president

whether OSI would consider giving the Engle group representation on its board of directors. *Id.* at L–690. OSI's president responded noncommittally. *Id.* Engle reported to Telco's board of directors on June 20, 1978 that he had not yet received a response to his informal request for representation. PX 59 at CR 14.

48. Charles Brickman, an investment banker who acted as an adviser to OSI management during 1978 and 1979, testified that sometime after Engle's visit OSI management came to believe Engle planned a hostile takeover of their company. Brinkman L–509. OSI management thereafter considered all shares in Engle's control to be hostile, and viewed the trust and its holdings as part of the Engle group. *Id.* at L–512. Because OSI management did not consider the Engle group hostile until well after the trust acquired its shares, those purchases in and of themselves could not have prompted OSI to seek acquisition by a "friendly" third party.

49. OSI filed suit against various members of the Engle group on September 1, 1978, seeking an order enjoining them from acquiring additional shares and from attempting to exercise control over the company's management. PX 59 at 2628. OSI filed another suit seeking similar relief against essentially the same parties on January 29, 1979, and on February 6, 1979, Telco's investment subsidiary, Telvest, sued OSI to enjoin implementation of an anti-takeover measure. *Id.* at 2641–43. The trust was not a party to any of this litigation, and never paid or was assessed any expenses connected with it. Engle L–330; PX 410 at 4.

50. In early April, 1979, OSI proposed an agreement under which the parties would settle their litigation, OSI would buy out the Engle group's stock holdings and pay a portion of the Engle group's legal fees, and the Engle group would pledge not to acquire any more shares of OSI. PX 60 at 2723–24. The Engle group considered this offer inadequate. *Id.* at 2726.

51. The minutes of a May 22, 1979 meeting of Telvest's board of directors indicate that the Engle group was then consid-

ering a tender offer by the Brown Group to acquire all outstanding shares of OSI for $15.00 per share. *Id.* at 2729–30. At the time, OSI's stock was selling at $14.50 per share. DX 600 at Ex. E. The Brown Group publicly announced its tender offer on June 1, 1979. PX 138. Kidder Peabody & Co., an investment bank retained by OSI to help fend off a hostile takeover, played a major role in encouraging the Brown Group's bid. Brickman L–525.

52. There is no evidence that the trust's purchases of OSI shares in March, 1978 had any impact on the Brown Group's decision to make its tender offer more than a year after those purchases occurred, nor is there any evidence that the trust's purchases played a role in the decision by OSI management to seek a tender offer from a "white knight". The trust's 12,500 shares of OSI represented less than one percent of OSI's outstanding stock at the time the Brown Group made its tender offer, PX 138, and therefore posed no threat to the Brown Group's acquisition of control over OSI. Fischel 1696–97. Moreover, in the unlikely event that the trust had rejected the tender offer, turning down a handsome profit and maintaining its imprudently large investment in OSI, the Brown Group could have forced the trust out as a shareholder by merging OSI with the Brown Group. *Id.* at 1697. Fischel testified that the same four factors responsible for Berkeley's and Cooper's decision to resist the Engle group led OSI management to seek a "white knight." Fischel 1695–96. The court accepts Fischel's explanation of the Engle group's profits on its OSI stock, as well as his conclusion that "[n]one of those factors were in any way related to the small investments by the pension trust." *Id.*

53. The Brown Group did not condition its tender offer on the trust's willingness to sell its shares of OSI; indeed, the terms of the offer required the Brown Group to purchase all tendered shares regardless of the trust's actions, so long as shareholders tendered at least 51 percent of the outstanding stock. PX 138; Matthews 2023. There is no evidence the Brown Group either expected the trust to tender its shares

or cared whether it did so. Accordingly, the court finds that the Brown Group would have made its tender offer and purchased the Engle group's shares even if it had expected the trust not to sell.

54. The trust accepted the tender offer on June 26, 1979 and sold its OSI stock to the Brown Group for $15.00 per share. 727 F.2d at 121. The sale brought the trust a profit of 141 percent on its original investment. *Id.* Even if the trust's participation had been essential to consummation of the Brown Group's tender offer, it would not have been in the trust's interest to reject that offer and retain its large, undiversified investment in OSI.

55. The evidence demonstrates that the Engle group did not profit in any way from the trust's investments in OSI.

*Hickory*

With respect to Hickory, plaintiffs claim that the Engle group profited by (a) reinvesting proceeds derived from the trust's investments in Berkeley and OSI, PX 412 at 12; and (b) using the trust's assets in its successful effort to gain control of Hickory.

56. Because the Engle group did not profit from the trust's investments in Berkeley and OSI, it could not have gained by reinvesting such profits in Hickory. The court accordingly turns to plaintiffs' second argument, that the Engle group used the trust's assets to help it gain control of Hickory.

57. The Engle group's holdings of Hickory stock rose above 50 percent of the company's outstanding shares in late October, 1980. PX 406 (Form 8–K filed Dec. 10, 1980). The Reliable trust owned no stock in Hickory then, having sold all its shares on March 19, 1979. The trust's purchases of Hickory stock thus played no direct role in the Engle group's acquisition of control over Hickory.

58. Plaintiffs suggest that the trust's purchases may have indirectly helped the Engle group gain control of Hickory by enabling it to apply equity accounting with respect to its Hickory investments begin-

ning in August, 1978. According to plaintiffs, this in turn increased the Engle group's financial resources and allowed additional investments in Hickory. Judge Leighton found at the first trial, however, that the trust's holdings of Hickory stock played no role in the Engle group's decision to use equity accounting, and the Seventh Circuit expressly declined to reject this finding, 727 F.2d at 132, n. 27. The evidence presented to this court is entirely consistent with Judge Leighton's determination. Although Telco did use equity accounting with respect to its investment in Hickory (something it did not do with respect to its investments in Berkeley and OSI), it did not take the trust's stock ownership into account in doing so. Torgerson 1899–1902.

59. The Seventh Circuit advances the possibility that the trust's actions could have aided the Engle group's acquisition program by depressing the stock price—perhaps by retaining its shares while the Engle group was accumulating stock, or by selling them at a low point in the market after the success of the Engle group's acquisition program was assured. 727 F.2d at 131. Plaintiffs have not pursued this hypothesis and no evidence promotes it in this exhaustive record. The trust's retention of its Hickory stock could not have depressed the market price for the benefit of the Engle group, since purchases by an investor ordinarily tend to increase the stock price, and any increase is not offset until she sells her shares. Fischel 1662; DX 600 at 9. By retaining its stock while the Engle group was buying, the trust thus increased rather than decreased the Engle group's acquisition costs.

60. The Engle group could not have gained from the trust's sale of its shares at a low price after the success of the Engle group's acquisition program was assured; if the sale had any impact at all on Hickory's stock price it would have been negative, DX 600 at 9, and the Engle group would have gained more by lowering the stock price earlier. Moreover, the trust's sale of its shares *after* the success of Engle group's program was assured could not have contributed to the success of that program. Any theorizing about the market reaction to the trust's sale of its shares is pointless, though, in light of the fact that Hickory's stock price was unchanged during the nine market days immediately following the trust's sale of its shares. DX 600 at Ex. F.

61. Because the evidence demonstrates that the trust's investments in Hickory played no direct or indirect role in the Engle group's acquisition of control over Hickory, and neither lowered the price at which the Engle group purchased its shares nor assisted its investment program in any other way, the court finds that the Engle group did not profit from the trust's investments in Hickory.

## B. Conclusions of Law

1. Under ERISA,

[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

2. The breaching fiduciaries—Dardick, Zuckerman, Libco, and Engle—therefore are liable to restore to the trust any losses the trust incurred as a result of their breaches of fiduciary duty, as well as any profits they made through use of the plan's assets. *Id.;* 727 F.2d at 137; *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir.1982). The court may require the breaching fiduciaries to disgorge their own profits only to the extent that "there is a causal connection between the use of the plan assets and the profits made by the breaching fiduciaries." 727 F.2d at 137.

3. "[T]he burden is on the defendants who are found to have breached their fidu-

ciary duties to show which profits are attributable to their own investments apart from their control of the Reliable Trust assets." 727 F.2d at 138.

4. In determining the amount that the breaching fiduciaries must restore to the trust as a result of the trust's investments in Berkeley, OSI, and Hickory, the court "should resolve doubts in favor of the plaintiffs." *Id.* at 138–39. This ensures that the trust does not suffer simply because the breaching fiduciaries' actions have made it difficult to calculate damages. *Id.*

5. Defendants have shown that no member of the Engle group—including the four breaching fiduciaries—profited from the trust's investments in Berkeley, Hickory, and OSI. Because defendants' profits on those stocks are attributable entirely to their own resources and investments, Dardick, Zuckerman, Libco, and Engle are not liable to pay any funds to the trust as restoration of profits gained through use of the trust's assets.

■ 6. Whether the trust lost money as a result of its investments in Hickory depends on whether the court views those investments individually or as a part of a portfolio consisting of Berkeley, OSI, and Hickory; as the court observed in its findings of fact, the former approach requires a finding of damages, while the latter requires a finding of no damages.

*Black's Law Dictionary* (5th ed., 1979) defines "portfolio" as follows: "[i]n investments, the collective term for all the securities held by one person or institution." *Accord, Webster's Third New International Dictionary* (1981); *The American Heritage Dictionary of the English Language* (1969). The trust's Hickory stock satisfies this definition to the extent that Hickory was simply one of three companies whose stock the trust held in the spring of 1978. But insofar as the definition of portfolio requires that the portfolio's components be acquired for *investment* purposes, the trust's purchases fall outside the definition, since the Seventh Circuit found that Dardick did not purchase Hickory stock solely for the benefit of the trust. 727 F.2d at 129–31. Because Dardick purchased Hickory's stock at least in part for purposes other than investment, and because ERISA's goal of protecting the integrity of employee trust funds requires exacting scrutiny of the actions of breaching fiduciaries, the court declines to consider the trust's Hickory shares as part of an investment portfolio. This conclusion compels a finding that the trust's Hickory purchases damaged the trust in the amount of the difference between the trust's actual earnings from those purchases, and what the trust would have earned by making a reasonably prudent alternative investment.

7. Fischel and Matthews calculated damages to the trust from its Hickory investments in six different ways, taking as their starting points six alternative investment strategies yielding different returns. While each of these strategies would have been reasonable, neither Fischel nor Matthews nor counsel for any party suggested how the court should select the single most appropriate alternative to the trust's Hickory investments.

■ 8. Because defendants bear the burden of proof on damages and the court must resolve all doubts in plaintiffs' favor, the court selects the most generous of the three measures of damages—all of which are reasonable—because defendants have not shown that a different measure is more appropriate. Accordingly, the court concludes that by investing trust assets in Hickory in breach of their fiduciary duties, Dardick, Zuckerman, Libco, and Engle caused damage to the trust in the amount of $6,704. This equals the difference between what the trust actually earned from its Hickory investments and what it would have earned by making a reasonably prudent alternative investment—namely, by dividing the same amount of money equally among all of Harris Bank's common stock funds.

9. Although the court has discretion to allow prejudgment interest on damage awards under ERISA, *see Katsaros v. Cody*, 744 F.2d 270, 281 (2nd Cir.1984), it declines to do so in this case for two reasons. First, had plaintiffs' counsel adopted

a more realistic attitude toward the size of the potential recovery from defendants, this litigation would have ended years ago and the prejudgment interest would have been insignificant. Gil Matthews bluntly but aptly appraised plaintiffs' theories of investment-related damages: "I think this whole case is foolhardy because I can't see that the numbers here are big enough to make it worth anyone's while to pursue this. I think the legal fees and the expert fees are absurd in relation to what I view the potential award as being." Matthews 2064. An award of prejudgment interest on modest damages on issues that more reasonable counsel could have resolved years ago would unduly reward wasteful, even profligate, litigation. Second, by selecting the highest possible measure of damages, the court has conceivably compensated plaintiffs well beyond their actual loss. Adding prejudgment interest would multiply this potential munificence.

### III. DELAY IN DISTRIBUTION OF TRUST ASSETS

#### A. *Findings of Fact*

1. The Restated Reliable Manufacturing Corporation Employees' Profit-Sharing Plan ("Restated Plan"), L–DX VV, incorporates the Trust Agreement for the Reliable Manufacturing Company Employees' Profit Sharing Trust ("Trust Agreement"), PX 8. L–DX VV at A. Section 9.1 of the Trust Agreement provides:

This Trust shall terminate upon the first to occur of the following:

(a) Thirty (30) days after the receipt by the Trustee of written notice of such termination from the Company;

(b) The date the Company shall be judicially declared bankrupt or insolvent;

(c) The dissolution, consolidation or reorganization of the Company, or the sale by the Company of all or substantially all of its assets without provision for continuing this Trust, except that in any such event provision may be made for the continuance of this Trust by any successor to the Company or any

purchaser of all or substantially all of its assets, and in that event such successor or purchaser shall be substituted for the Company hereunder.

PX 8.

2. Section 5.6 of the Restated Plan provides in relevant part:

The distributions of the Account provided hereunder shall be made in such one or more of the methods following as the Committee,[5] in its sole discretion, may determine:

(a) one lump sum payment; or

(b) payments in equal monthly, quarterly, semi-annual or annual installments, over a period not exceeding ten (10) years; or

(c) payments over the life of the Participant and/or his spouse.

\* \* \* \* \* \*

Notwithstanding anything to the contrary stated in Section 5.1 through 5.6, a Participant or beneficiary, unless he shall agree to the contrary, shall be entitled to a distribution within sixty days after the close of the Year coinciding with or following the date of entitlement.

L–DX VV. The committee determined to pay beneficiaries' interests in annual installments over a 10–year period. PX 351 at 69.

3. Section 7.2 of the Restated Plan provides:

The Employer shall have the right at any time to discontinue its contributions hereunder and to terminate this Agreement and the Trust hereby created, by delivering to the Trustee and the Committee written notice of such discontinuance or termination.

Upon complete discontinuance of the Employer's contributions, partial or complete termination of the Trust [sic] all Participants' accounts shall become fully vested, and shall not thereafter be subject to forfeiture. Upon termination of the Trust, the Committee shall direct the Trustee to distribute all assets remaining in the Trust, after payment of any expenses properly chargeable against the

---

**5.** The "Committee" consisted of Dardick and Zuckerman. PX 351 at 47.

Trust, to the Participants in accordance with the value of such Participants [sic] accounts as of the date of such termination in cash or in property valued at fair market value as of the date of distribution and in such manner as the Committee shall determine. The Committee's determination shall be conclusive upon all parties.

Upon termination, if there shall be any assets in the Trust Fund which have not been allocated to any Participant but are part of the Trust Fund, such assets shall be distributed to each Participant in the same proportion as the amount credited to the account of each Participant bears to the total of the amounts credited to the accounts of all Participants in such Trust.

L–DX VV.

4. Libco purchased 100 percent of Reliable's stock in April, 1977. 727 F.2d at 116. During 1977, customers returned large numbers of one of Reliable's products because of a design defect, and the company's sales fell. Zuckerman 469–70; Zuckerman L–456–57; P1X 58. Reliable ended the 1977 fiscal year with a loss, P1X 58, making no contributions to the profit-sharing trust after March 31 of that year, L–DX III.

5. Reliable's sales again were weak in the fall of 1978, due to a sluggish market and damage to the company's reputation from the previous year's design problems. Zuckerman 480–41.

6. Zuckerman, who was Reliable's chief operating officer, Zuckerman 233, told a meeting of Libco's board of directors on August 1, 1978 that demand for Reliable's products was falling and the company had lost roughly $400,000 during the first seven months of 1978. PX 58 at CR 22–23. Reliable's poor sales and the large volume of customer returns left it with unbalanced inventories and excessive amounts of raw materials. Zuckerman at L–456–57. Zuckerman told Libco's board at the August 1 meeting that he was developing a plan for "liquefying" the company's assets by reducing inventories and converting them into finished goods that could be sold for cash, which in turn would allow Reliable to retool and reenter the market with a more suitable product mix. *Id.;* PX 58 at CR 22–23. When Zuckerman used the term "liquefying", he meant that the objective of his plan was to increase the company's liquidity—that is, to increase the amount of cash available to Reliable. *Id.;* Engle 800–01. Zuckerman did not mean that he planned to liquidate the company or cease operations. *Id.* In November or December, 1978, Zuckerman decided that Reliable would produce at a high volume until it ran down its inventories, since the economies of higher volume production would enable it to produce at lower cost. Zuckerman 484.

7. Between March, 1978 and February, 1979, Reliable borrowed $907,000 from Harris Bank and approximately $600,000 from Libco. As of February, 1979, Reliable owed a total of $655,000 to Harris Bank and $443,000 to Libco. PX 311.

8. Reliable did not earn a profit in 1978, and accordingly did not contribute money to the profit-sharing trust. L–DX XX.

9. Libco president George Contarsy, a director of Reliable, Contarsy L–388–89, told a Libco board meeting on December 28, 1978 that Reliable probably would lose between $800,000 and $1,000,000 in 1978. Zuckerman told the board Reliable was trying to work out a plan to minimize the risk of further losses and allow a reasonable return on Libco's investment. Among other options, Reliable was considering contracting out its manufacturing function. PX 58 at 2596–97. At the time, top officers of both Libco and Reliable considered Reliable a troubled but viable company.

10. Harris Bank resigned as the trust's trustee in December, 1978 because of its concern over repeated delays in obtaining proper documentation for certain of the trust's securities transactions (transactions which did not involve Berkeley, OSI, and Hickory). Meyer L–557–60. National Boulevard Bank agreed on January 2, 1979 to become the new trustee for the trust, and received its assets on February 5, 1979. PX 183. .

11. On or about February 28, 1979, Reliable laid off 75 of its 81 workers, Zucker-

man L-461, telling them it planned to let them know by mid-April whether or not it would recall them, PX 351 at 19. *See also* Zuckerman 336-38. The remaining workers performed office tasks, maintenance, clean-up, and shipping. Zuckerman 338; PX 29 at 308-09. Reliable's lease on its manufacturing and office facility expired in February, 1979, but the company remained on the premises after that date, paying rent of $3000 per month. Zuckerman 357; PX 311 at Ex. 17. Although Reliable terminated its last employee sometime in the summer of 1979, it subsequently hired some former employees as independent contractors to work on an hourly basis. *Id.* No one remained on the premises after October or November, 1979. *Id.* at 31. The company retained its brokered sales force during this period. Zuckerman 354.

12. Despite the seriousness of Reliable's financial problems in the late winter and spring of 1979, neither Zuckerman nor Libco believed the company was beyond recovery. Zuckerman had recently revived another failing company with only a few of its employees left, Zuckerman 488, and Libco was reluctant to walk away from its more than one million dollar investment in Reliable, *Id. See also, id.* at 454-55. Zuckerman believed Reliable had two good products and at least one large customer, and that the company might survive by changing its product line, moving its plant, or eliminating its stamping operation and continuing in business as an assembly or distribution operation. *Id.* at 486-87.

13. Reliable's creditors filed an involuntary bankruptcy petition against Reliable on March 8, 1979, and on March 16, 1979 Reliable converted the proceedings into voluntary proceedings under Chapter 11. 727 F.2d at 136; PX 30; PX 25A. The bankruptcy court adjudicated Reliable a bankrupt on December 5, 1979. DX 628. Reliable's management knew that its creditors planned to file an involuntary bankruptcy petition several weeks before they actually did so. Zuckerman L-471.

14. Lawrence Hoffman, National Boulevard Bank's vice president in charge of employee benefits and the official responsible for the bank's duties as trustee of the Reliable trust, learned in February, 1979 of the lay-offs of a majority of Reliable employees. Hoffman 1265; Hirsch 1985. After consulting with the bank's counsel about the significance of these lay-offs for distribution of the trust's assets, he told Dardick and Zuckerman that under the circumstances he would be uncomfortable making distributions to beneficiaries without a determination letter from the Internal Revenue Service ("IRS") stating that recent events had caused a termination of the trust. Zuckerman 489-90; Hoffman 1263-64. Zuckerman then called Austin Hirsch, an attorney who had previously performed work for the trust, and asked him to request such a letter from the IRS. Hirsch 1985-86. The trust retained Hirsch for this purpose on February 25, 1979. Zuckerman L-457-58; IntX 401.

15. Hirsch wrote a letter dated March 1, 1979 to the Employees' Plans Division of the IRS in Chicago. This letter informed the IRS that "[d]ue to adverse business conditions and a seasonal layoff, approximately 75 of the 81 employees participating in the Plan have been temporarily laid off as of approximately March 1, 1979. At this juncture, it is unknown whether or not Reliable Manufacturing Corporation will be in a position to re-hire these individuals within the next several months." PX 1. The letter went on to inquire (1) whether, assuming Reliable did not rehire a substantial percentage of its employees, there would be a partial termination of the plan, and if so, (2) whether all of the terminated employees would be fully vested and (3) whether the plan's committee "would commence distribution of accrued benefits within 60 days of the Plan Year after a service break in accordance with the Plan provisions." Hirsch concluded with a request for a conference with the IRS before any final determination. *Id.* The letter did not refer to the impending bankruptcy filings.

16. Hirsch persistently attempted to follow up on his request for a determination. On April 27, 1979 he learned that the Chicago office of the IRS had forwarded the request to Washington, and he asked for a

copy of the transmittal letter. DX 625. On June 1 he asked the IRS for an expedited response to the request, and he did so again on June 13. L–DX DD. The IRS finally acknowledged receipt of the trust's request on July 10, L–DX EE, but when Hirsch had received no further response by August 7 he wrote yet another letter seeking expedited review. L–DX FF. During the time the trust's request for a letter of determination was pending with the IRS, Zuckerman repeatedly asked Hirsch about the status of the request, in an effort to speed up distribution of trust assets to the beneficiaries. Zuckerman 486.

17. When Reliable discharged its employees in February, 1979, it did not tell them it had applied to the IRS for a determination of whether a termination had occurred, nor did it suggest that disbursement of their benefits depended in any way on action by the IRS. Zuckerman at L–468–69.

18. In early September, 1979, Hirsch finally received an oral opinion from the IRS, which he summarized in a confirming letter to the IRS dated September 6, 1979. Hirsch's letter said in part:

> Based upon the facts and circumstances set forth in the March 1, 1979 letter, you have concluded that in accordance with Regulation 1.401.6(b)(2) promulgated by the Treasury Department that a partial termination of the Reliable Manufacturing Corporation Employees Profit Sharing Plan has occurred as a result of the significant reduction in the percentage of participants in the Plan. Consequently, the amounts credited to the account of the affected employees are nonforfeitable. You provided as reference Section 401(a)(7) of the Internal Reveue Code and Section 411(d)(3) of the Employee Retirement Income Security Act of 1974.

L–DX GG. The trust subsequently withdrew its request for a determination. PX 3.

19. On September 14, 1979, Zuckerman wrote Larry Hoffman, who managed the trust's affairs for National Boulevard Bank, informing him that the IRS had found a partial termination of the trust, and that the trust's committee "desires to have a distribution made to the employees of the Trust." L–DX HH.

20. Two weeks later, on September 28, 1979, Dardick and Zuckerman asked the district court in this case to approve a release form which they proposed to send to all trust beneficiaries. (Although the Court of Appeals' opinion states that Dardick and Zuckerman sought approval of the release form on September 14, 1979, their motion for approval is dated September 28, 1978, and stamped as received on that date.) The terms of the proposed form gave beneficiaries two choices: they could receive immediate lump sum payment of vested funds if they were willing to release defendants from all liability, including liability in this action; or they could receive their vested benefits over a ten-year period, subject to an unspecified reserve for litigation expenses. 727 F.2d at 136. The district court rejected the proposed release on October 16, and instructed Dardick and Zuckerman to prepare a revised form that did not require beneficiaries to release their claims in this action. *Id.*

21. Dardick and Zuckerman then prepared a revised form which released Reliable, (along with its directors, officers, and employees), the Committee (including Dardick, Zuckerman, and their attorneys), and National Boulevard Bank from all causes of action except those raised in this case. PX 11; DX 622; L–DX YYY. The district court approved the revised form over plaintiffs' objections on November 16, 1979, and shortly thereafter Dardick and Zuckerman mailed the form and an explanatory cover letter to each plan participant. PX 11; Zuckerman 444–46.

22. Engle testified credibly that he never asked Dardick or Zuckerman to delay distribution of the trust's assets, Engle 1841, and Zuckerman testified equally credibly that no one ever asked him to delay distribution of the trust's assets for any reason, Zuckerman 486. Defendants' actions with respect to termination of the trust and distribution of its assets were taken in good faith and not for the purpose

of delaying distribution of trust assets to beneficiaries. There is no evidence defendants sought to delay distribution of trust assets in order to prolong the Engle group's control over the trust's holdings of Berkeley, OSI, and Hickory stock.

23. Even if defendants had delayed distribution of trust assets, the damages assessed in part II of this court's decision would compensate plaintiffs for any loss they suffered by reason of the delay. At all times before their distribution, trust assets were invested in money market funds, corporate bonds, and stocks (primarily Berkeley, OSI, and Hickory). *See* Meyer L–547–48, 598–600. Plaintiffs have never complained about the rates of return on the trust's money market and bond investments, and thus only could have lost money from a delay in distribution if the trust's stock investments yielded less during the delay than plaintiffs could have earned by reasonable alternative investments. During any delay in distribution the trust's Berkeley and OSI stock would have earned well above the rate of return on any other reasonable investment, however, and its Hickory stock would have earned the subpar return for which the court assessed damages in part II of this decision.

### B. *Conclusions of Law*

1. For a profit-sharing trust to be "qualified" under § 401 of the Internal Revenue Code, 26 U.S.C. § 401, the plan of which it is a part must expressly provide that employees' benefits become nonforfeitable "upon the termination of the plan or upon the complete discontinuance of contributions under the plan." 26 C.F.R. § 1.407–6(a)(1). The plan also must provide that unless a trust beneficiary agrees otherwise, payments to the beneficiary shall begin no later than 60 days after the close of the plan year in which the latest of three events occurs: (1) the beneficiary reaches the age of 65 or some other retirement age specified in the plan; (2) the 10th anniversary of the beneficiary's participation in the plan; or (3) termination of the beneficiary's employment. 26 U.S.C. § 401(a)(14).

2. Consistent with these requirements, the Restated Plan provides that "[u]pon complete discontinuance of the Employer's contributions, partial or complete termination of the Trust [sic] all Participants' accounts shall become fully vested, and shall not thereafter be subject to forfeiture." § 7.2. The Restated Plan also provides that "[n]otwithstanding anything to the contrary stated in Sections 5.1 through 5.6 [dealing with distributions upon retirement, death, disability, and termination of employment, as well as loans to participants and the method for paying distributions], a Participant or beneficiary, unless he shall agree to the contrary, shall be entitled to a distribution within sixty days after the close of the year coinciding with or following the date of entitlement." § 5.6.

3. Before it can decide whether defendants breached their fiduciary duties to the trust by delaying distribution of benefits, the court must determine when defendants were obliged to begin making distributions. Plaintiffs argue that the following paragraph from § 7.2 of the Restated Plan requires defendants to make lump sum distributions of benefits *immediately* after complete discontinuance of employer contributions or complete termination of the trust:

Upon complete discontinuance of the Employer's contributions, partial or complete termination of the Trust [sic] all Participants' accounts shall become fully vested, and shall not thereafter be subject to forfeiture. Upon termination of the Trust, the Committee shall direct the Trustee to distribute all assets remaining in the Trust, after payment of any expenses properly chargeable against the Trust, to the Participants in accordance with the value of such Participants [sic] accounts as of the date of such termination in cash or in property valued at fair market value as of the date of distribution and in such manner as the Committee shall determine. The Committee's determination shall be conclusive upon all parties.

4. The court rejects plaintiffs' interpretation of § 7.2 for two reasons. First,

nothing in the language of § 7.2 specifies a time or manner of distribution. Section 5.6, by contrast, provides generally for the time and manner of distributions, requiring the Committee to begin distributions no later than 60 days after the close of the year in which a beneficiary becomes entitled to distribution, and offering a choice of three approved methods of distribution. By its terms § 5.6 applies to *all* distributions made under the Restated Plan, and there is no reason to believe its drafters meant to give special treatment to distributions following termination of the plan.

Second, the only reason to suspect that § 7.2 might require distribution immediately after termination is its use of the word "upon"—as in *"[u]pon termination of the Trust, the Committee shall direct the Trustee to distribute...."* But the Restated Plan also uses "upon" in the same way where immediate distributions clearly are not required. Even though the Restated Plan provides for distribution "[u]pon Retirement," § 5.1, distribution "[u]pon the death of a Participant," § 5.2, and distribution "[u]pon termination of a Participant's employment for any reason other than retirement, death, or total disability," § 5.4(a), it is clear from § 5.6 that distributions arising from any of these events need not begin until 60 days after the end of the year in which the event occurred.

Accordingly, the court concludes that the trust was not required to begin making distributions to beneficiaries earlier than 60 days after the end of the year in which Reliable completely discontinued its contributions to the plan, or in which the plan completely terminated. The court thus must now determine the year or years in which these events occurred. It turns first to the question of when Reliable completely discontinued its contributions to the plan.

■ 5. Although Reliable made its last contribution to the trust in March, 1977, that does not necessarily coincide with a "complete discontinuance" of contributions under ERISA and its related regulations. Whether a suspension of contributions constitutes a complete discontinuance sufficient to trigger a distribution of benefits turns on the employer's intent and on "all the facts and circumstances in the particular case." 26 C.F.R. § 1.401–6(c)(1). Because the evidence demonstrates that Reliable suspended its contributions to the profit-sharing trust after March, 1977 simply because it had no profits to share, and that it intended to remain in business and resume contributions if and when it returned to profitability, the court concludes that no complete discontinuance of contributions occurred at that time. Rather, the court concludes that a complete discontinuance of contributions occurred on or about February 28, 1979, because that is the date when a series of factors—the layoff of Reliable's production workers, the absence of specific plan by management for resuming production, and the impending bankruptcy proceedings—combined to make it plain that Reliable's management had no present intent to resume contributions. *See* 26 C.F.R. § 1.401–6(c)(1).

6. Whether a termination of a plan has occurred "is generally a question to be determined with regard to all the facts and circumstances in a particular case. For example, a plan is terminated when, in connection of the winding up of the employer's trade or business, the employer begins to discharge his employees." 26 C.F.R. § 1.401–6(b)(2). Based upon the record of communications between the IRS and representatives of the trust, it is apparent that the IRS found the trust to have terminated —either partially or completely—no earlier than February 29, 1979. This court agrees with the IRS. February 28, 1979 marked the convergence of several factors relevant to whether a termination had occurred: layoffs of virtually all production workers; impending bankruptcy, management's lack of a specific plan for resuming production, and no reasonably apparent capacity for corporate survival. Accordingly, the court concludes that complete termination of the plan occurred no earlier than February 28, 1979. *Accord, Leigh v. Engle,* 619 F.Supp. 154, 157 (N.D.Ill.1985) (Moran, J.) ("Termination of the Plan occurred sometime in 1979.")

■ 7. Because there was neither a complete discontinuance of contributions nor a complete termination of the plan prior to February 28, 1979, the earliest date that the trust could have had to begin making distributions to beneficiaries was 60 days after the end of 1979—that is, on March 1, 1980. There is no evidence or allegation that defendants delayed the start of distributions beyond March 1, 1980, so the court concludes that defendants did not breach their fiduciary duties by delaying distribution of trust assets.

■ 8. Plaintiffs contend that defendants also breached their fiduciary duties to the trust by proposing, in September, 1978, a release form that would have allowed beneficiaries to receive lump sum distributions only if they relinquished their claims in this action. This effort, while reflecting defendants' cavalier attitude toward the trust and its beneficiaries, cannot give rise to liability for damages because it caused no harm; no beneficiary ever received the form, and defendants' proposal did not delay the start of distributions beyond the required date of March 1, 1980.

## IV. PUNITIVE DAMAGES

*Conclusions of Law*

1. Plaintiffs urge the court to award punitive damages against all defendants found in breach of their fiduciary duties. Although neither plaintiffs' second amended complaint nor intervenors' complaint specifically requests punitive damages, defendants have not objected to the court's consideration of this belated demand and have joined issue with plaintiffs on whether ERISA permits punitive damages, and if so whether a punitive damage award is appropriate in this case. Because the court answers the first question in the negative, it is unnecessary to consider the second.

2. The parties' proposed conclusions of law on the issue of punitive damages are sorely lacking: in support of their assertion that ERISA allows punitive damage awards, plaintiffs cite only *Russell v. Massachusetts Life Insurance Co.*, 722 F.2d 482 (9th Cir.1983), which held that an individual beneficiary may maintain a claim for punitive damages against a breaching fiduciary—but which was reversed on precisely that point by the Supreme Court, *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (individual suing on his own behalf may not recover punitive damages under ERISA). For their part, defendants simply cite *Sommers Drug Stores Co. v. Corrigan Enterprises, Inc.*, 793 F.2d 1456 (5th Cir.1986), and *Pokratz v. Jones Dairy Farm*, 771 F.2d 206 (7th Cir. 1985), and assert without elaboration that these cases establish the unavailability of punitive damages under ERISA.

3. They do no such thing. *Massachusetts Mutual* deals only with the availability of punitive damages to individual beneficiaries; the Court explicitly refused to decide whether a plan, or an individual suing on behalf of a plan or all its beneficiaries, can recover punitive damages. 473 U.S. at 144, 105 S.Ct. at 3091. Although *Sommers* does hold that punitive damages are never recoverable under ERISA, it is not from this circuit and other courts deciding the issue since *Massachusetts Mutual* have reached contrary conclusions, *see Schoenholtz v. Doniger*, 657 F.Supp. 899, 913–16 (S.D.N.Y.1987); *James A. Dooley Associates Employees Retirement Plan v. Reynolds*, 654 F.Supp. 457, 460–61 (E.D.Mo. 1987). *But see, Powell v. Chesapeake & Potomac Telephone Co. of Virginia*, 780 F.2d 419, 424 (4th Cir.1985) (ERISA does not allow punitive damages). *Pokratz*, defendants' Seventh Circuit citation, is irrelevant because it merely applies *Massachusetts Mutual*, rejecting an individual beneficiary's claim for punitive damages. 771 F.2d at 210.

4. The dispute over the availability of punitive damages under ERISA turns on the interpretation of § 409(a) of ERISA, 29 U.S.C. § 1109(a), which provides that anyone who breaches his fiduciary duty to a plan

shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary

which have been made through use of assets of the plan by the fiduciary, *and shall be subject to such other equitable or remedial relief as the court may deem appropriate,* including removal of such fiduciary.

(Emphasis added.)

5. Those who find authority in ERISA for punitive damage awards rely on the underlined portion of § 409(a). They reason that punitive damages traditionally have been available in actions for equitable relief, that ERISA's legislative history evidences Congressional intent to give courts wide flexibility in fashioning remedies for fiduciary misconduct, and that the authority in § 409(a) for "such other equitable or remedial relief as the court may deem appropriate" resembles the remedial section of the Griffin-Landrum Act, 29 U.S.C. § 412, which allows "a person whose rights ... have been infringed ... to bring a civil action ... for such relief as may be appropriate"—language courts have interpreted to authorize punitive damages. *See Schoenholtz,* 657 F.Supp. at 913–16; *Dooley,* 654 F.Supp. 460–61.

6. In *Sommers* and *Powell,* the Fourth and Fifth Circuits emphasize two reasons for rejecting punitive damage awards under ERISA. First, contrary to the claims in *Schoenholtz* and *Dooley,* punitive damages are not a traditional equitable remedy. Second, ERISA's legislative history indicates that Congress intended common law trust principles to govern fiduciary relationships under ERISA, and the common law of trusts does not treat punitive damages as "equitable relief." *Sommers,* 793 F.2d at 1463–64; *Powell,* 780 F.2d at 424.

7. *Sommers* and *Powell* are persuasive. The common law of trusts generally does not allow punitive damages, and makes exceptions only in cases of extraordinary fiduciary disloyalty or malicious conduct, neither of which is present here. G. Bogert & G. Bogert, *The Law of Trusts and Trustees* § 862, at 39–41 (2d ed. 1982); *Restatement (Second) of Trusts* § 205 (1959). Moreover, while it is true courts have construed the Landrum-Griffin Act to allow punitive damages for breach of a union's duty of fair representation "where the union or its officials have acted with malicious intent or at least reckless and wanton indifference to the plaintiff's rights," *Quinn v. DiGiulian,* 739 F.2d 637, 648–49 (D.C.Cir.1984) (collecting cases), courts have construed another employee-protection statute lacking specific remedial provisions, the Railway Labor Act, 45 U.S. § 151 *et seq.,* to preclude punitive damage awards, *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979).

■ 8. Congress meant courts to have considerable discretion in fashioning remedies for breaches of fiduciary duty under ERISA, but the legislative history suggests discretion limited by the bounds of common law, not judicial imagination. The common law of trusts does not make punitive damages generally available as a remedy for breach of fiduciary duty absent extraordinary misconduct, and there is no basis for reading such a remedy into ERISA. The court rejects plaintiffs' request for punitive damages.

## V. ATTORNEYS' FEES

### A. *Findings of Fact*

1. Section 11.1 of the Trust Agreement provides:

The Trustee shall not incur any personal liability in connection with any act done or omitted to be done in good faith and with reasonable care and prudence in the administration of the Trust, and shall be indemnified and saved harmless by the Company, or from the Trust Fund, or both, from and against all liability to which the Trustee shall be subjected by reason of any such act or conduct, including all expenses reasonably incurred in its defense if the Company fails to provide such defense.

PX 8. Section 6.4 of the Restated Plan contains a similar provision.

2. Section 1.6 of the Restated Plan provides:

Unless otherwise determined by the Employer, the members of the Committee shall serve without compensation for

services as such, but all expenses of the Committee may be paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Committee, including, but not limited to, fees of accountants, counsel, and other specialists, and other costs of administering the Plan. In the event that the expenses are not paid by the Employer, then such expenses shall be reimbursed by the Trustee.

L–DX VV. Reliable—"the Employer"—did not pay the legal fees and other expenses of Dardick and Zuckerman in this litigation, *see* IntX 418–20; 619 F.Supp. at 159, so the trust did so pursuant to § 1.6 of the Restated Plan and § 11.1 of the Trust Agreement, *id.;* PX 8; L–DX VV.

3. Nothing in either the Trust Agreement or the Restated Plan authorizes the trust to reimburse Reliable, Libco, or the directors of those companies for legal fees incurred in connection with administration of the plan. PX 8; L–DX VV.

4. Section 9.2 of the Trust Agreement provides in part:

"Upon termination of this Trust the Trustee shall first reserve such reasonable amounts as it may deem necessary to provide for the payment of any expenses then or thereafter chargeable to the Trust Fund. Subject to such reserve, the balance of the Trust Fund shall be liquidated and distributed by the Trustee to or for the benefit of the employees or former employees of the Company, or their beneficiaries, as directed by the Company."

PX 8. The trust retained a reserve of approximately $100,000 and distributed the remainder to plan participants during the several months following approval of the revised release form. IntX 418.

5. Approximately $80,000 remained in the trust on June 27, 1985, when Judge Moran, before whom this case was then pending, determined that continued retention of this amount was unnecessary and ordered the trust to distribute $60,000 to beneficiaries within 21 days. *Leigh v. Engle*, 619 F.Supp. 154, 159 (N.D.Ill.1985).

### B. *Conclusions of Law*

1. "[I]ndemnification for legal fees when a breach of trust has been established, though perhaps provided for by the trust agreement, is not allowed under ERISA." 619 F.Supp. at 159. Nothing in ERISA prohibits a trust from indemnifying its fiduciaries for legal expenses unrelated to breaches of their duties, however, and § 1.6 of the Restated Plan requires the trust to reimburse Committee members for their legal expenses when Reliable fails to do so, as it has in this case.

2. It follows that Dardick and Zuckerman are entitled to reimbursement from the trust (or more accurately, to retain funds advanced by the trust) for legal expenses not attributable to their fiduciary violations. Unfortunately, it is difficult to identify these expenses with precision. In one sense their legal expenses are entirely their own fault, since plaintiffs never would have filed this suit had Dardick and Zuckerman not made the mistake of investing trust assets in Berkeley, OSI, and Hickory. On the other hand, despite the fact that Dardick and Zuckerman neither profited personally from the trust's investments nor delayed the distribution of trust assets, they have had to spend considerable time and money refuting ill-considered allegations of such wrongdoing.

3. Plaintiffs have prevailed against Dardick and Zuckerman to the extent of establishing that they breached their fiduciary duties by investing trust assets in Berkeley, OSI, and Hickory, and that this breach caused the trust a loss of $6,704 on its Hickory investment. Because ERISA bars a trust from indemnifying breaching fiduciaries for legal expenses attributable to their breaches, Dardick and Zuckerman may not receive trust assets to defray legal expenses incurred in responding to plaintiffs' successful "wrongful investment" claim.

4. Plaintiffs' remaining claims against Dardick and Zuckerman—that they profited from the trust's stock investments and delayed distribution of its assets—are a different matter. These unsuccessful claims turn on facts that have little in

common with those at issue in plaintiffs' successful wrongful investment claim.

5. Proving that Dardick and Zuckerman wrongly invested trust assets required plaintiffs to retrace the Engle group's investment program and point out the conflict of interest that arises when a fiduciary makes speculative investments in companies in which his employer is simultaneously acquiring significant financial interests. To establish that this misconduct caused the trust's loss on its Hickory investments, plaintiffs had only to show that prudent alternative investments would have yielded higher returns.

By contrast, plaintiffs' claim that Dardick and Zuckerman personally profited from the trust's investments turns on price movements in Berkeley, OSI, and Hickory stocks, on the circumstances surrounding the trust's (and the Engle group's) sale of those stocks, and on expert testimony about possible economic or market relationships between the trust's investments and the Engle group's profits. Plaintiffs' unsuccessful claim that Dardick and Zuckerman delayed distribution of trust assets is factually even more remote from plaintiffs' wrongful investment claim, turning on the circumstances surrounding Reliable's business decline and the trust's efforts to secure a letter of determination from the IRS.

6. Because plaintiffs' two unsuccessful claims against Dardick and Zuckerman are factually and legally distinct from their lone successful claim against those defendants, ERISA does not bar the trust from paying the legal expenses that Dardick and Zuckerman incurred in refuting those claims, pursuant to § 1.6 of the Restated Plan. See Hensley v. Eckerhart. 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (in awarding statutory attorneys' fees to plaintiffs prevailing on some but not all claims, courts may award fees attributable to pursuit of an unsuccessful claim only if that claim shares a common core of facts and a related legal theory with a successful claim); Spanish Action Committee of Chicago v. City of Chicago, 811 F.2d 1129, 1133 (7th Cir.1987).

7. In holding that Dardick and Zuckerman are entitled to reimbursement from the trust for their legal fees in defending against plaintiffs' "illicit profit" and "delay damages" claims, but not against their "wrongful investment" claim, the court is aware of the difficulty of attributing each dollar of legal costs to one claim or another. Because ERISA prohibits trusts from reimbursing the legal expenses of breaching fiduciaries, and Dardick and Zuckerman did breach their fiduciary duties in one respect, they must bear the burden of demonstrating that any legal expenses for which they seek reimbursement are attributable solely to plaintiffs' unsuccessful claims.

8. Nothing in the Trust Agreement or Restated Plan authorizes the trust to pay the expenses of Libco, Engle, Telco, or Telvest in this litigation, and they must reimburse the trust for any expenditures made on their behalf. All issues relating to these reimbursements should, of course, be resolved before any attorneys' fees are paid out.

9. Because plaintiffs did not prevail on any of their claims against National Boulevard Bank, the bank is entitled to complete reimbursement of its legal expenses from the trust under § 11.1 of the Trust Agreement and § 6.4 of the Restated Plan.

10. In addition to determining the trust's responsibility for defendants' attorneys' fees, the court has discretion to award attorneys' fees to any party, 29 U.S. C. § 1132(g)(1). The exercise of this discretion should depend on:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant question regarding ERISA; and (5) the relative merits of the parties' positions.

727 F.2d at 139 n. 39. *Accord, Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 828–31 (7th Cir.1984). The court also must bear in mind that "[W]here an ERISA beneficiary substantially prevails on the merits of his or her claim, an award of fees with respect to such a claim against the party in question would almost always be an abuse of discretion." *Id.* at 140.

11. The court already has noted that plaintiffs' claim against Dardick, Zuckerman, Libco, and Engle for improperly investing trust assets is factually and legally distinct from their claims that those defendants profited by the trust's stock investments and that all defendants improperly delayed distribution of trust assets. Because the three claims are distinct, and because plaintiffs prevailed on the first but not the latter two claims, it is appropriate to consider them separately for the purpose of determining whether to award attorneys' fees under § 1132(g). *See Hensley, supra.*

12. Applying the five-part test set out by the Court of Appeals in this case, there is good reason to award attorneys' fees to plaintiffs for their successful claim that Dardick, Zuckerman, Libco, and Engle breached their fiduciary duties by investing trust assets as they did. (1) Dardick, Zuckerman, Libco, and Engle were grossly negligent in investing a substantial portion of the trust's assets in three speculative stocks. (2) The four breaching fiduciaries have the resources to pay a fee award and are better able than plaintiffs to bear this cost. (3) An award of attorneys' fees to prevailing plaintiffs will tend to deter similar fiduciary misconduct in the future. (4) Plaintiffs (or at least intervening plaintiffs) brought this lawsuit on behalf of all plan participants, not merely for individual gain. (5) The liability of the four breaching fiduciaries is not a close question; even minimal reflection should have led them to realize it was unlawful to invest 30 percent of the trust's assets in three speculative stocks.

13. There is less reason to award attorneys fees to defendants for the two claims on which they prevailed. (1) Although plaintiffs were wrong in claiming that defendants profited by the trust's stock investments and unlawfully delayed distribution of its assets, plaintiffs did not litigate in bad faith. The circumstances of defendants' misconduct could have fostered a reasonable suspicion that the breaching fiduciaries had acted to further their own interests at the expense of the trust. (2) Until their termination by Reliable, most of the plaintiffs were factory workers with modest wages. Ordering them to pay attorneys' fees for the claims on which defendants prevailed could cause substantial hardship, while there is no evidence defendants are unable to pay their own fees. (3) An award of attorneys' fees to defendants might deter future suits in circumstances where defendants' liability is not a foregone conclusion, since plaintiffs naturally would be reluctant to risk assessments of attorneys' fees. This would be inconsistent with the remedial purposes of ERISA. (4) Defendants' successful defense of the claims against them did not benefit the plan, and an award of attorneys fees would further deplete the trust's assets. (5) Although defendants' position on the merits of plaintiffs' delay damages and illicit profits claims was distinctly stronger than plaintiffs' position on those claims, plaintiffs did not litigate in bad faith.

14. Determining with precision the portion of plaintiffs' attorneys' fees attributable to their wrongful investment claim would be a difficult and time-consuming task—particularly, as Judge Moran so aptly noted, "[g]iven the proclivity in this case ... for everything to escalate into a pierhead brawl," 619 F.Supp. at 159. Because extended litigation over attorneys' fees will only drain the trust, the court chooses to approximate the correct fee award by ordering defendants to pay plaintiffs' legal fees through the date of the Seventh Circuit's decision but no further. The litigation leading up to that decision established the only significant legal principles to arise from this lawsuit, and also resolved the principal factual issues on which plaintiffs prevailed. Plaintiffs have accomplished little since then other than further depleting

the trust's assets by forcing its fiduciaries to incur reimbursable attorneys' fees. Awarding attorneys' fees to plaintiffs for this most recent portion of the case would reward litigation that was ill-conceived, often poorly executed, and fractious.

15. An award of legal fees for the prior stages of the case is entirely appropriate, however. Plaintiffs established then that Dardick and Zuckerman breached their fiduciary duties with respect to the trust's investments, and plaintiffs' success before the Seventh Circuit made almost inevitable this court's subsequent finding that Libco and Engle likewise breached their fiduciary duties. Plaintiffs also made it plain in the prior stages of this litigation that what Dardick, Zuckerman, Libco, and Engle did is intolerable; they played roulette with the retirement funds of employees who worked for years at modest wages, relying on defendants' pledge to safeguard their pensions. The fact that defendants' gamble paid off in this instance renders their conduct no more savory. If other fiduciaries roll the same dice with other trust funds it is inevitable that someday, somewhere, employees will lose benefits they had counted on for their retirement. Perhaps the defendants in this case are too young, too wealthy, and too comfortable to have contemplated the enormity of the risk they took, and the human suffering so narrowly averted. Because ERISA does not allow punitive damages, an award of attorneys' fees under 29 U.S.C. § 1132(g) is the court's only means to deter similar misconduct in the future.

16. Accordingly, pursuant to 29 U.S.C. § 1132(g) the court orders Dardick, Zuckerman, Libco, and Engle to pay the reasonable attorneys' fees incurred by counsel for plaintiffs prior to issuance of the Seventh Circuit's amended decision on March 20, 1984. Because the parties have not raised the issue, the court does not consider the allocation between plaintiffs and intervening plaintiffs of its award of attorneys' fees to "plaintiffs".

## VI. CONCLUSION

Perhaps only Charles Dickens could savor this litigation. For nearly a decade now, the parties have fought bitterly over the Reliable trust, the only noticeable effect being the steady diminution of its assets. The advocacy has been harsh and often vituperative: lawyers have accused each other of personal wrongdoing, discovery disputes continued through the last day of trial, and shouting matches have broken out. If it were possible to bottle the contempt, even hatred, which the lawyers and parties feel for one another, there would be enough to sustain a small civil war for months. The great length and extraordinary difficulty of this litigation owes much to the depth of the combatants' animosity.

Plaintiffs struggle mightily to portray defendants as evil capitalists who sought to deprive dedicated workers of their pension benefits. The record simply does not support such a conclusion. While the four breaching fiduciaries were deplorably cavalier and vincibly oblivious to the chasm between investments appropriate for a pension fund and those appropriate for a venture capital fund, the evidence clearly establishes that they neither profited nor intended to profit by the trust's investments, and did not seek to delay distribution of its assets. It should have been apparent to plaintiffs' counsel early in the present phase of this litigation that while Dardick, Zuckerman, Libco, and Engle did breach their fiduciary duties by improperly investing the trust's assets, this misconduct did not significantly damage the trust or benefit the Engle group. Counsel's deep emotions may have obscured their view of the merits.

In summary, the court concludes as follows: (1) Libco and Engle breached their fiduciary duties by failing to adequately supervise Dardick's and Zuckerman's investments of trust assets; (2) Dardick's, Zuckerman's, Libco's, and Engle's breaches of fiduciary duty with respect to the trust's investment in Hickory damaged the trust in the amount of $6,704, and they must restore that amount to the trust; (3) none of the defendants profited by the improper investment of trust assets; (4) none of the

defendants breached their fiduciary duties by delaying the distribution of trust assets to beneficiaries; (5) Dardick and Zuckerman are entitled to reimbursement from the trust for expenses that they can show are attributable solely to their defense against plaintiffs' claims that they (a) personally profited from the trust's stock investments, and (b) delayed the distribution of trust assets; (6) National Boulevard Bank is entitled to reimbursement from the trust for all of its expenses in this litigation; and (7) Dardick, Zuckerman, Libco, and Engle must pay the reasonable attorneys' fees incurred by counsel for plaintiffs and intervening plaintiffs until issuance of the Seventh Circuit's amended decision on March 20, 1984.